Alan P. Block (SBN 143783)
**MCKOOL SMITH, P.C.**
300 South Grand Avenue, Suite 2900
Los Angeles, CA 90071
Telephone: (213) 694-1200
Facsimile: (213) 694-1234
Email: ablock@McKoolSmith.com

Blair M. Jacobs (*pro hac vice* forthcoming)
Christina A. Ondrick (*pro hac vice* forthcoming)
John S. Holley (*pro hac vice* forthcoming)
Elizabeth T. Bernard (SBN 309010)
Arvind Jairam (*pro hac vice* forthcoming)
Stuart S. McCommas (*pro hac vice* forthcoming)
**MCKOOL SMITH, P.C.**
1999 K Street, NW, Suite 600
Washington, District of Columbia 20006
Telephone:  (202) 370-8300
Facsimile:  (202) 370-8344
Email: bjacobs@McKoolSmith.com

Attorneys for Plaintiff NETGEAR, Inc.

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NETGEAR, INC.,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>HUAWEI TECHNOLOGIES CO., LTD.,<br><br>　　　　Defendant. | Case No.<br><br>**COMPLAINT FOR**:<br><br>1) VIOLATION OF SECTION 2 OF THE SHERMAN ACT (MONOPOLIZATION);<br><br>2) VIOLATION OF SECTION 2 OF THE SHERMAN ACT (ATTEMPTED MONOPOLIZATION);<br><br>3) VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT;<br><br>4) CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT; |

5) BREACH OF CONTRACT;

6) DECLARATORY JUDGMENT OF IMPLIED LICENSE AND/OR EXHAUSTION;

7) FRAUD;

8) NEGLIGENT MISREPRESENTATION;

9) PROMISSORY ESTOPPEL;

10) VIOLATION OF CAL. BUS. & PROF. CODE §17200.

**DEMAND FOR JURY TRIAL**

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

COMPLAINT

Plaintiff NETGEAR, Inc. ("NETGEAR") files this Complaint against Defendant Huawei Technologies Co., Ltd. ("Huawei") and alleges as follows:

## I.   NATURE OF THE ACTION

1.   This is a civil action brought under federal and state laws against Huawei for violation of Section 2 of the Sherman Act, violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), violation of Cal. Bus. & Prof. Code § 17200, breach of contract, declaration of implied license and/or exhaustion, fraud, negligent misrepresentation, promissory estoppel, and for such other relief as the Court deems just and proper.

2.   This action arises out of Huawei's misrepresentations to standards organizations, abusive licensing practices, anti-competitive behavior, unfair business practices, breach of contract, scheme to defraud and dominate markets worldwide, pattern of racketeering activity, and other behavior that violates federal and state law.

3.   Huawei participated in the IEEE Standards Association ("IEEE-SA" or "IEEE") standard-setting process for Wi-Fi technologies, among others. The IEEE is a standard-setting organization ("SSO"). Standards are published documents that establish technical specifications for products, methods, and/or services people use every day. Standards also provide a useful framework enabling different types of devices and devices from different manufacturers to communicate with one another.

4.   IEEE members, like Huawei, indicate whether they will license their standard essential patents ("SEPs") on reasonable and non-discriminatory ("RAND") terms and conditions to those who implement the standards should any of their technologies be included in the standard. SEPs are thus different than other patents because they are infringed by virtue of practicing the standard.

5.   On information and belief, Huawei provided false Letters of Assurance to IEEE, representing that Huawei would license its SEPs on RAND terms while not intending to honor its representation. Huawei made this false promise to induce members to include Huawei's technologies in the standards and companies like

1
COMPLAINT

NETGEAR to include the standard technology in its products sold worldwide.

6. After deceiving IEEE, its members and implementers of Wi-Fi technologies, Huawei has exploited its unlawfully acquired power against NETGEAR, including, by way of example:

- refusing to license its patents on RAND terms;
- demanding excessive and discriminatory royalties from NETGEAR and companies like NETGEAR that implement technologies from standards, including Wi-Fi standards;
- discriminating against NETGEAR in its pricing demands against NETGEAR;
- refusing to provide proof that its licensing terms and conditions are demonstrably free from discrimination;
- seeking an injunction in Dusseldorf, Germany proceedings before performing any of its IEEE obligations; and
- seeking an injunction in proceedings before the Unified Patent Court.

7. NETGEAR is a ready and willing licensee of Huawei's Wi-Fi SEPs. Huawei is refusing to negotiate a RAND license in good faith with NETGEAR.

8. Huawei's RAND deceit is part of a scheme to dominate markets worldwide. Huawei is willfully and knowingly involved in a pattern of racketeering activity, which includes, among other things, Huawei's false promises to license its SEPs on RAND terms and attempts to extract supracompetitive rates and injunctions, which constitute mail and/or wire fraud. Huawei injures companies by requiring users and implementers in the United States to pay non-RAND fees for standardized products. Huawei does this by making and acting on threats to seek injunctive relief against users and implementers.

9. Huawei has engaged in a pattern of racketeering activity for many years and defrauded many victims, not just NETGEAR. For example, according to the Superseding Indictment against Huawei by the Department of Justice in the Eastern

District of New York, Huawei has a pattern of using fraud and deceit to abuse intellectual property rights and is primarily in the business of racketeering activity throughout the United States.

10.    Huawei has not acted alone in its racketeering activities. Huawei has acted with others, including at least, on information and belief, Huawei Technologies USA Inc. ("Huawei USA") and Huawei Device USA Inc. ("Huawei Device USA"), manufacturers of communications products headquartered in the United States, and Futurewei Technologies, Inc. ("Futurewei"), a separate research and development company headquartered in the United States, with offices in California and Texas, that is home to Huawei's U.S. IPR Department,[1] as part of a "Huawei Enterprise." Futurewei, Huawei Device USA, and Huawei USA are involved in the non-RAND and misappropriation activities involving United States victim companies, as detailed herein. Huawei, Futurewei and Huawei Device USA are also identified as members of the enterprise in the Superseding Indictment.

11.    On information and belief, Huawei's fraudulent, unfair and anti-competitive actions have only intensified since the United States banned Huawei products in the United States, and Huawei's actions against United States companies are retaliatory.

## II.    THE PARTIES

12.    NETGEAR is a Delaware corporation with its principal place of business at 350 East Plumeria Drive, San Jose, California, 95134.

13.    NETGEAR, founded in California in 1996, is a United States company that embodies the American start-up success story. NETGEAR is an industry-leading provider of home and business Wi-Fi products. NETGEAR engages in continuous

---

[1] https://www.huawei.com/en/media-center/Transform/04/Huawei-IPR-Vision-and-Strategy; *see also* Jan Lanhee Lee, *Exclusive: Huawei's U.S. research arm builds separate identity*, Reuters, June 24, 2019, https://www.reuters.com/article/idUSKCN1TP2DG/.

innovation and makes significant investments in research and development for its Wi-Fi products. NETGEAR's Wi-Fi products are sold in the United States, in California and in this District. NETGEAR products can be found in approximately 24,000 retail locations worldwide. NETGEAR generated net revenue of $932.5 million, $1.17 billion, and $1.26 billion in 2022, 2021 and 2020, respectively.

14. NETGEAR is a leader in connecting the world to the Internet with advanced networking technologies for homes, businesses and service providers. NETGEAR delivers award-winning network solutions for remote work, distance learning, UHD streaming, online gameplay and more. NETGEAR products include a range of connected solutions, from easy-to-use high-performance Orbi Mesh Wi-Fi systems and the Nighthawk portfolio of Wi-Fi routers to numerous other networking products that enable people to collaborate and connect to a world of information and entertainment. NETGEAR's high-performance, easy-to-use premium Wi-Fi internet networking solutions include Wi-Fi 6 and Wi-Fi 6E Triband and Quad-band mesh systems, routers, 4G/5G mobile products, and smart devices such as Meural digital canvasses. Every day, millions of people around the world rely on NETGEAR products, with the United States constituting the largest market for NETGEAR's products.

15. NETGEAR and Huawei are competitors. Both companies sell, among other things, Wi-Fi products, including products that comply with the Wi-Fi 6 and Pre-Wi-Fi 6 standards.

16. On information and belief, Huawei is a Chinese corporation with its principal place of business at Huawei Base, Bantian, Longgang District, Shenzhen 518129, People's Republic of China. The People's Republic of China is a signatory to the Hague Service Convention, and Huawei may be served through the Central Authority in that country.

17. On information and belief, Huawei is a wholly-owned subsidiary of Huawei Investment & Holding Co., Ltd., which is a Chinese corporation based in the

4
COMPLAINT

People's Republic of China.

18. On information and belief, Huawei receives significant support from the Chinese government. During its early days, Huawei depended largely on government subsidies to acquire know-how from Western firms, including United States companies, to infiltrate itself into a market where it previously had no presence. The Chinese government has continued to exercise control over Chinese companies such as Huawei, including the use of "golden shares" called "special management shares" that give the Communist Party decisive voting rights or veto power over certain business decisions.

19. The United States government has placed successive sanctions on Huawei due to national security concerns, including banning Huawei from selling telecommunications equipment and devices in the United States. Huawei continues to do business in the United States, directly and indirectly, by, among other things, attempting to extort exorbitant licensing fees for patents that Huawei contends are essential to standards relating to Wi-Fi and other technologies.

20. On information and belief, Huawei is part of a multinational enterprise that operates itself and its subsidiaries or affiliates (including Huawei USA, Huawei Device USA and Futurewei). On information and belief, Huawei Device USA is a Texas corporation with its principal place of business at 16479 Dallas Parkway, Suite 355, Addison, Texas 75001-3586. On information and belief, Huawei USA is a Texas corporation with its principal place of business at 16479 Dallas Parkway, Suite 355, Addison, Texas 75001-3586. Futurewei is a Texas corporation having offices at 2220 Central Expressway, Santa Clara, California 95050. On information and belief, Huawei directly or indirectly controls each of its subsidiaries or affiliates, including Huawei USA, Huawei Device USA and Futurewei, and the Huawei Enterprise.

21. Huawei does business in the United States, California, and in this District, directly or through intermediaries and the Huawei Enterprise.

22. Huawei operates under and identifies with the trade name Huawei. The

other Huawei entities identified herein also operate and/or have operated with the trade name Huawei.

23. As detailed more fully below, the United States government has indicted Huawei in the Eastern District of New York for violation of several provisions of the U.S. Code. The indictment alleges that the principal purpose of the Huawei Enterprise "was to grow the global 'Huawei' brand into one of the most powerful telecommunications equipment and consumer electronics companies in the world by entering, developing and dominating the markets for telecommunications and consumer electronics technology and services in each of the countries in which the Huawei Enterprise operated."

### III. JURISDICTION AND VENUE

24. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1337, 1367, and 2201-02 and 18 U.S.C. § 1964. This Court has supplemental jurisdiction over the state claims because those claims form part of the same case or controversy as the federal claims. This Court may grant declaratory relief in this action at least pursuant to 28 U.S.C. §§ 2201 and 2202.

25. This Court also has jurisdiction over this action under 28 U.S.C. § 1332(a)(2) because Huawei is a citizen or subject of a foreign state, and NETGEAR is a Delaware corporation with its principal place of business in San Jose, California. The amount in controversy exceeds $75,000.

26. Huawei is subject to personal jurisdiction in this Court and California pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

27. The Court further has personal jurisdiction over Huawei pursuant to 18 U.S.C. § 1965(b), which provides: "In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof." The ends of

justice require the exercise of personal jurisdiction over Huawei because Huawei is engaged in a RICO enterprise as described herein and knew its conduct was intended to cause injury to NETGEAR, a California resident, and, on information and belief, there is no single jurisdiction where Huawei is otherwise subject to personal jurisdiction.

28.     The Court further has personal jurisdiction over Huawei pursuant to 18 U.S.C. § 1965(d), which provides: "All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." Huawei transacts its affairs in the United States and California and is thus subject to jurisdiction pursuant to 18 U.S.C. § 1965(d).

29.     Huawei is also subject to this Court's specific and general personal jurisdiction because Huawei regularly solicits business in California, has continuous and systematic business contacts with California, has minimum contacts with California and has committed acts giving rise to this action within California.

30.     Huawei has conducted substantial business in the United States and California and intends to continue to do so, directly or through intermediaries, including activities directed toward the licensing of Huawei's SEPs.

31.     Through its corporate parent, subsidiaries and affiliates (including Huawei USA, Huawei Device USA and Futurewei), Huawei has engaged in a plan to dominate the market for telecommunications technology and services throughout the globe and, in particular, in the United States, California and this District. Huawei, along with Futurewei and, on information and belief, Huawei USA, engaged and continues to engage in activities to extort non-RAND rates for its alleged SEPs, racketeering activities, and anti-competitive activities.

32.     Faced with allegations and regulatory restrictions in the United States, Huawei has expanded its business to include licensing its patents as a source of

revenue to replace lost United States sales revenue.[2]

33.   Huawei is engaged in, or has engaged in, patent licensing negotiations and discussions with United States companies, including NETGEAR and companies like NETGEAR with offices in California, seeking exorbitant royalty payments. Huawei directed those communications to the United States and California and involved, coordinated, supervised and controlled the actions of Futurewei, and on information and belief, Huawei USA, in such patent licensing discussions.

34.   On information and belief, Huawei has employed and/or contracted with individuals who reside and work within California and this District, operated the Huawei Enterprise in California and this District per the Superseding Indictment, and continues to do so.

35.   Huawei operates in the United States and in California individually and through its participation in the Huawei Enterprise.

36.   On information and belief, Huawei's primary revenue-generating activity in the United States is licensing its patents, and Huawei derives substantial revenue from its patent licensing efforts. Huawei has been growing its revenue through licensing activities, in part to offset the government restrictions that the United States and other governments have placed on sales and importation of Huawei products.[3]

37.   Huawei has directed license requests to NETGEAR in the United States. Among other contacts, beginning on July 9, 2020, Huawei sent via email and express mail letters to NETGEAR addressed to NETGEAR's Chairman and Chief Executive Officer located in California.

---

[2] *See, e.g.*, Evelyn Cheng, *Huawei turns to patents for a lifeline — including those in the U.S.*, CNBC (Feb. 5, 3023) https://www.cnbc.com/2023/02/06/huawei-turns-to-patents-for-a-lifeline-including-those-in-the-us.html; Bloomberg, *Verizon spokesperson calls Huawei's 173-page lawsuit a 'PR stunt'*, HT Tech (Aug. 20, 2022) https://tech.hindustantimes.com/tech/news/huawei-files-a-173-pagelawsuit-against-verizon-story-opZYBUqmvDbWTOLEknbZuO.html.

[3] Paresh Dave, *Huawei reaps more patent royalties than it pays out for second straight year*, Reuters (Dec. 23, 2022, 2:28 PM), https://www.reuters.com/technology/huawei-reaps-more-patent-royalties-than-it-pays-out-second-straight-year-2022-12-23/.

COMPLAINT

38.     As further described below, Huawei thereafter contacted NETGEAR personnel located in California six times, including but not limited to NETGEAR's CEO, COO, CTO and legal counsel, to engage in licensing discussions and urged NETGEAR to stop making, manufacturing, using, offering to sell, selling and importing NETGEAR products in jurisdictions where Huawei holds Wi-Fi patents, which includes the United States. After suing NETGEAR in Germany without warning, Huawei continued its contacts with NETGEAR personnel located in California. Huawei further informed NETGEAR that it would serve legal papers on NETGEAR's headquarters in California and requested NETGEAR engage in licensing discussions for Huawei's Wi-Fi SEPs. Thereafter, Huawei contacted NETGEAR legal counsel located in California to commence licensing negotiations between the parties. These licensing negotiations included personnel from NETGEAR located in California and Huawei, Futurewei and, on information and belief, Huawei USA personnel located in the United States (on information and belief, in Texas and California). These discussions are described below.

39.     The parties conducted at least three meetings, with NETGEAR personnel participating from California and Futurewei and/or Huawei USA personnel participating from the United States, including personnel located, on information and belief, in California and Texas.

40.     This lawsuit arises out of Huawei's contacts with California in connection with its anti-competitive activities, false RAND commitments, and racketeering activity. Huawei directed its conduct to California and knew its conduct was intended to cause injury to NETGEAR, a California resident. The Huawei Enterprise, as defined below, is operated in California by and through Futurewei.

41.     Because of Huawei's contacts with California, the exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice.

42.     Alternatively, based on the facts alleged above, Huawei is subject to personal jurisdiction in this Court, at least pursuant to Fed. R. Civ. P. 4(k)(2).

9

COMPLAINT

43.     As Huawei is a Chinese corporation, venue is proper in any judicial district in the United States and thus proper in this District. Venue is also proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, 18 U.S.C. § 1965(b), and 28 U.S.C. §§ 1391(b)-(d). Further, on information and belief, according to the Superseding Indictment issued by the U.S. Department of Justice in the Eastern District of New York criminal proceedings, and as described below, the Huawei Enterprise has operated in this District.

## IV.   FACTUAL BACKGROUND

### A.   Standard-Setting Organizations

44.     Technology standards play a central role in the communication technologies sector, where independently designed innovations are highly interconnected. Such a complex technological system requires companies to work together to guarantee interoperability of their technologies, products, and services. SSOs play a critical role in this context by allowing the development of standards through the collaboration of different stakeholders for the benefit of implementers. A critical role of SSOs is to regulate the licensing of SEPs.

45.     SSOs are organizations established to, among other things, develop, institute, and disseminate technical standards and specifications in various industries. SSOs in the communications industries include, for example, the Institute of Electrical and Electronics Engineers in the United States. Technical specifications and standards for communications technologies are often developed through the efforts of SSOs and their membership to establish specifications (or recommendations) that allow for seamless interconnectivity of devices in a particular technology, such as Wi-Fi, Bluetooth, 4G, 5G, etc.

46.     Technical standards play a critical role in the development of Wi-Fi technology and other technologies. In general, technical standards—such as those for Wi-Fi—have the potential to encourage innovation and promote competition among equipment suppliers and network providers. And, as applied to Wi-Fi, technical

standards facilitate interoperability by ensuring wireless devices can communicate seamlessly with each other regardless of the manufacturer or technology used. The technical specifications (or recommendations) for most standards are published and broadly available. Product designers and manufacturers are thus willing to invest heavily in the development of standardized products and components because, so long as their products are compliant with the published technical standard, those products will operate effectively within the networks and be compatible with other products from third parties, while at the same time receiving the benefits provided by the commitments undertaken by companies, like Huawei, that declare their patents as standard essential.

47. Standards development also reduces costs for both suppliers and purchasers. For suppliers, standardization reduces the need, in many instances, to develop products to a particular purchaser's specifications. Accordingly, because a single product or product line may be sold to multiple purchasers and distributed more widely, manufacturing volumes increase and per-unit costs decrease. Purchasers benefit from increased price competition among suppliers.

48. These networks and products are based on technologies and standards developed through SSOs and adopted, at least in part, by industry participants. SSOs implement policies and procedures to control the disclosure and licensing of patents held by their members, and that may read on adopted standards and/or those being developed. A patent on the technology and standards developed by the SSOs is called an SEP. In order to reduce the likelihood that implementers of standards will be subject to abusive and anti-competitive practices by SEP holders, SSOs have adopted rules, policies and procedures that address the disclosure and licensing of patents that SSO participants may assert are essential to the implementation of the standard under consideration. These policies and procedures are set out in each SSO's intellectual property rights policies ("IPR policies") and/or in declarations or letters pursuant to those policies.

COMPLAINT

49.     These policies and/or undertakings pursuant to those policies constitute contractual commitments to offer SEPs in accordance with the terms of those policies. Such SSO IPR policies and undertakings can include, among other things, an obligation to license patents declared standard essential on Reasonable and Non-Discriminatory ("RAND") terms and conditions, also known as "FRAND" (Fair, Reasonable and Non-Discriminatory). As detailed herein, the IEEE's IPR policy and other SSO IPR policies obligate members to irrevocably commit to granting licenses to implementers of the standards for essential patents on RAND terms and conditions that are fair, reasonable and non-discriminatory.

**B.      IEEE**

**1.      Background and Governance**

50.     IEEE is a New York not-for-profit organization as described in Section 501(c)(3) of the Internal Revenue Code of 1986. It is the world's leading professional organization engaged in the advancement of technology and the leading developer of technical standards in the United States.

51.     The IEEE has a Standards Association. The Standards Association of IEEE is governed by a Board of Governors, which established the IEEE Standards Board. The Standards Board is responsible for coordinating the development of IEEE standards. The IEEE promulgates technical standards in a variety of fields, and its members may participate in the standards-setting process in working groups and/or subgroups called task groups.

52.     The Standards Board uses a committee structure to study issues and make recommendations for Standards Board action. One of these committees is the Patent Committee, which is responsible for providing oversight of the use of patents in the development of IEEE standards and the development of the IEEE's IPR policies.

**2.      Standards Development at IEEE**

53.     IEEE is a neutral forum for the development of standards, guides, and recommended practices within the broad range of IEEE members' areas of expertise.

From its Ethernet and Wi-Fi standards to its recommended practices for electric power distribution, IEEE promotes innovation, enables the creation and expansion of international markets, and helps protect health and public safety. During the relevant time period, the IEEE developed standards on the principle of one-entity / one-vote and is open to materially interested corporations and other entities, such as colleges and government agencies.[4]

54.    The IEEE developed the 802.11 standards, which are commonly known as the Wi-Fi standards. The letters after "IEEE 802.11" indicate the generation of the Wi-Fi standard as set forth in Table 1 below.

**TABLE 1**

| IEEE 802.11 Generation | Name[5] |
|---|---|
| 1997 | * Wi-Fi 0 |
| b | * Wi-Fi 1 |
| a | * Wi-Fi 2 |
| g | * Wi-Fi 3 |
| 2007 (merged 802.11 a, b, c, d, e, g, h, i, and j) | N/A |
| n | Wi-Fi 4 |
| 2012 (merged with 802.11 k, n, p, r, s, u, v, y, and z) | N/A |
| 2013 / ac | Wi-Fi 5 |
| 2016 (merged 2012 along with 802.11 ae, aa, ad, ac, af, and mc) | N/A |
| 2020 (merged 2016 along with ai, ah, aj, ak, aq, and md) | N/A |

---

[4] Letter from the Institute of Electrical Engineers, Inc. and its Standards Association, IEEE-SA Request for Business Review Letter 1-2 (Nov. 29, 2006), https://www.justice.gov/sites/default/files/atr/legacy/2014/01/28/302148.pdf.

[5] * Wi-Fi 0, 1, 2, and 3 are named by retroactive inference. ** Variations of Wi-Fi 6.

13
COMPLAINT

| ax | Wi-Fi 6 |
|---|---|
| ay | ** Defined next generation in 60 GHz (2021) |
| ba | ** Defined Wake Up Radio (2021) |

55.     These Wi-Fi standards are based on technologies and standards developed through the IEEE and adopted, at least in part, by industry participants. Wireless standards like IEEE 802.11 play an important role in ensuring interoperability between products that operate in accordance with such standards, facilitating the adoption and advancement of these technologies.

56.     NETGEAR, together with other companies involved in communications and wireless technologies, worked for years to develop and deploy various wireless technologies, including purported standardized technologies such as IEEE 802.11. NETGEAR has sold and sells Wi-Fi products globally that include components purportedly operating in accordance with the various 802.11 standards and is a beneficiary of the IEEE and 802.11 standard-setting process.

### 3.     IEEE and Its Patent Policies

57.     The IEEE seeks to produce standards that any willing implementer can use and that will become widely adopted. With the increasing prevalence and scope of patents and the potential for their inclusion in standards, the IEEE explicitly permits the inclusion of patented technology in certain circumstances. The IEEE becomes aware of potentially essential patents through a Letter of Assurance ("LOA") from participants to the IEEE. The IEEE expects that participants will act in good faith and disclose patents held by themselves and/or their affiliated entities that potentially might prove essential or identify any other persons who might hold potentially essential patents. A patent whose claims are necessarily infringed by practicing the standards is called an SEP or Essential Patent Claim.

58. The definition of SEP under the IEEE Standards Board Bylaws §6.1 is: "'Essential Patent Claim' shall mean any Patent Claim the practice of which was necessary to implement either a mandatory or optional portion of a normative clause of the [Proposed] IEEE Standard when, at the time of the [Proposed] IEEE Standard's approval, there was no commercially and technically feasible non-infringing alternative implementation method for such mandatory or optional portion of the normative clause. An Essential Patent Claim does not include any Patent Claim that was essential only for Enabling Technology or any claim other than that set forth above, even if contained in the same patent as the Essential Patent Claim."

59. The IEEE policy permits the known use of essential patents (and patent applications), but only if IEEE receives the patent holder's or applicant's assurance that either (a) the patent holder or applicant will not enforce any of its present or future essential patent(s) against any person complying with the standard; or (b) the patent holder or applicant will make available a license for such implementation without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination, *i.e.*, RAND. This assurance is irrevocable once submitted and accepted and shall apply, at a minimum, from the date of the standard's approval to the date of the standard's withdrawal.

60. The IEEE's rules and policies require fairness and candor concerning intellectual property. The IEEE's IPR policies are intended to reduce the likelihood that implementers of the standards will be subject to abusive and anti-competitive practices by patent holders and to enable the IEEE and its members to develop standards free from potentially blocking patents. These policies and/or undertakings pursuant to those policies constitute contractual commitments to offer SEPs in accordance with the terms of those policies.

61. The IEEE has developed licensing rules and added them to its governing bylaws. SEP holders must declare the ownership of patents that may be infringed by implementing a standard, and they commit to accepting a RAND royalty as

15
COMPLAINT

compensation for their SEPs (a "RAND commitment"). The IEEE allows "Blanket Declarations," which are a generic statement through which a contributor declares to hold essential patents for a standard without specifying the patent numbers.

62.     In order for IEEE's patent policy to function efficiently, individuals participating in the standards development process must inform the IEEE (or cause the IEEE to be informed) of the holder of any potential Essential Patent Claims of which they are personally aware and that are not already the subject of an accepted LOA that are owned or controlled by the participant or the entity the participant is from, employed by, or otherwise represents. Additionally, individuals participating in the standards development process should inform the IEEE (or cause the IEEE to be informed) of any other holders of potential Essential Patent Claims that are not already the subject of an accepted LOA.

63.     If the IEEE learns that an IEEE standard or proposed standard may require the use of a potential Essential Patent Claim, the IEEE requires the patent holder to provide a LOA or state it is not aware of any patent claims that it may own, control or have the ability to license that might be or become Essential Patent Claims.

64.     When the IEEE learns of an Essential Patent Claim for which licensing assurance cannot be obtained, the IEEE refers the matter to its Patent Committee. On information and belief, historically, the IEEE has not included technology in a standard unless it could obtain a LOA.

### i.     The 2007 IEEE Patent Policy

65.     In 2007, IEEE adopted a patent policy that expressly permitted (but did not require) a patent holder to disclose its proposed licensing maximum rates and other terms. As IEEE explained in its 2006 business review letter request, IEEE adopted this policy because:

> The difficulty with the [pre-2007] policy is that a RAND commitment is inherently vague. It can lead to expensive litigation whose cost and risk can impede the adoption of a socially valuable standard. Even where a license negotiation does not result in litigation, the ex post negotiation of license terms (that is, negotiations occurring after a technology's inclusion in a standard has increased the patent-holder's market power,

potentially to the point of monopoly) can lead to higher royalty payments and ultimately higher prices to consumers.[6]

66.     The 2007 patent policy was intended to provide a mechanism for reducing the inherent vagueness of a RAND commitment, including the meaning of "reasonable rate." Specifically, the 2007 policy was in effect until March 14, 2015, and explained in §6.2 that a LOA shall be either:

a) A general disclaimer to the effect that the Submitter without conditions will not enforce any present or future Essential Patent Claims against any person or entity making, using, selling, offering to sell, importing, distributing, or implementing a compliant implementation of the standard; or

b) A statement that a license for a compliant implementation of the standard will be made available to an unrestricted number of applicants on a worldwide basis without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination. At its sole option, the Submitter may provide with its assurance any of the following: (i) a not-to-exceed license fee or rate commitment, (ii) a sample license agreement, or (iii) one or more material licensing terms.[7]

67.     The 2007 policy further made clear a patent-holder's assurance is irrevocable and runs with the patent, and an assurance binds the submitter's affiliates unless the submitter identifies affiliates that it does not wish to bind.[8]

### ii.    The 2015 / 2019 / 2023 IEEE Patent Policies

68.     On March 15, 2015, the IEEE provided new definitions related to RAND rates and negotiations,[9] including: (1) the definition of "Reasonable Rate"; (2) the definition of "Compliant Implementation"; (3) the availability of "Prohibitive Orders" (injunctions and exclusion orders); and (4) permissible demands for a reciprocal

---

[6] Letter from the Institute of Electrical Engineers, Inc. and its Standards Association, *supra note* 4 at 2-3.

[7] *IEEE-SA Standards Board Bylaws (in effect through Mar. 14, 2015),* https://grouper.ieee.org/groups/pp-dialog/email/pdfPyO3I_zm6q.pdf.

[8] Letter from the Institute of Electrical Engineers, Inc. and its Standards Association, *supra note* 4 at 4.

[9] *IEEE-SA Standards Board Bylaws* (2015), https://web.archive.org/web/20160414020735/http://standards.ieee.org/develop/policies/bylaws/sb_bylaws.pdf.

17
COMPLAINT

license.[10]

1.  "Reasonable Rate:" The IEEE 2015 policy defined "Reasonable Rate" and provided three recommended factors in determining a Reasonable Rate.[11]

    i.   Definition: "appropriate compensation to the patent holder for the practice of an Essential Patent Claim excluding the value, if any, resulting from the inclusion of that Essential Patent Claim's technology in the IEEE Standard."[12] The "[p]atent holder is compensated, but not for value conferred by inclusion in standard."[13]

    ii.  Recommended Reasonable Rate Factors: (i) Value contributed "to the value of the relevant functionality of the smallest saleable Compliant Implementation that practices the Essential Patent Claim"; (ii) Value contributed "in light of the value contributed by all Essential Patent Claims for the same IEEE Standard practiced in that [smallest saleable] Compliant Implementation"; and (iii) "Existing licenses" that "were not obtained under the explicit or implicit threat of a Prohibitive Order" and "otherwise sufficiently comparable" circumstances.[14]

2.  "Compliant Implementation:" The IEEE 2015 policy provided clarity on the definition of "Complaint Implementation" as "any product (e.g., component, sub-assembly, or end-product) or service that conforms to any mandatory or optional portion of a normative clause of an IEEE Standard" and provided that the requested licensing assurance shall extend to any Compliant Implementation that practices the Essential Patent Claims "for use in conforming with the IEEE Standard."[15]

3.  "Availability of Prohibitive Orders:" The IEEE 2015 policy provides that the submitter (or its successor) of a Letter of Assurance "should engage in good faith negotiations (if sought by either party) without unreasonable delay," and that the patent holder agrees that it will not seek a Prohibitive Order unless the implementer "fails to participate in" or "fails . . . to comply with the outcome of" an adjudication, including an affirming first-level appellate review . . . ."[16]

---

[10] *Id.*, 15-16.

[11] *Id.*, 16.

[12] *Id.*

[13] *Tutorial for 802 on 2015 IEEE-SA Patent Policy Update*, IEEE Standards Association 17 (July 13, 2015), https://www.ieee802.org/802_tutorials/2015-07/802_Patent_Policy_Tutorial_Slides_13_July_2014.pdf.

[14] *IEEE-SA Standards Board Bylaws* (2015), *supra* note 9, at 16; *Tutorial for 802 on 2015 IEEE-SA Patent Policy Update*, *supra* note 13, at 18.

[15] *Tutorial for 802 on 2015 IEEE-SA Patent Policy Update*, *supra* note 13, at 19;

[16] *Tutorial for 802 on 2015 IEEE-SA Patent Policy Update*, *supra* note 13, at 20;

18
COMPLAINT

4.   "Permissible Demands for Reciprocal License:" The IEEE 2015 policy provided that a "Submitter of Accepted LOA can require licensee to give Submitter a license for licensee's own Essential Patent Claims for the same IEEE Standard" but "Submitter cannot both demand reciprocal licenses and exclude patents held by Submitter's affiliate."[17]

69.   On June 13, 2019, the IEEE provided a "Limited" LOA and the "[d]efined terms on the custom LOA form dated 13 June 2019 – Limited reference the IEEE SA Patent Policy in effect as of 14 March 2015 and are as defined therein."[18]

70.   The Custom LOA Form Dated 13 June 2019 — Limited stopped being accepted as of January 1, 2023.[19] As of January 1, 2023, "in instances where there is one Submitter of an Accepted LOA under the 2015 policy and another Submitter of an Accepted LOA under a subsequent policy or using the Custom LOA Form Dated 13 June 2019 – Limited, the IEEE SA Board of Governors resolved that neither Submitter shall have a greater right to seek a Prohibitive Order against the other Party. In such instances, the least restrictive provisions regarding Prohibitive Orders shall apply to both Parties, except to the extent otherwise not permitted by law."[20]

71.   The IEEE patent policies continue to recommend considerations for determining a Reasonable Rate, including considering comparable license agreements and the value that the Essential Patent Claim contributes to the smallest saleable Compliant Implementation.[21] The policy also provides that "[t]he Submitter of an

_IEEE-SA Standards Board Bylaws_ (2015), _supra_ note 9, at 15, 17-18.

[17] _Tutorial for 802 on 2015 IEEE-SA Patent Policy Update_, _supra_ note 13, at 21; _IEEE-SA Standards Board Bylaws_ (2015), _supra_ note 9, at 16-17.

[18] _Understanding Patent Issues During IEEE Standards Development_, IEEE Standards Association 6, https://standards.ieee.org/wp-content/uploads/import/governance/bog/resolutions/ september2022-updates-faqs.pdf

[19] _Id_.

[20] _IEEE Announces Decision on Its Standards-related Patent Policy_, Business Wire (Sept. 30, 2022 12:31 PM), https://www.businesswire.com/news/home/20220930005084/en/IEEE-Announces-Decision-on-Its-Standards-related-Patent-Policy.

[21] _IEEE SA Standards Board Bylaws_, IEEE-SA (Dec. 2022), https://standards.ieee.org/wp-content/uploads/import/documents/other/sb_bylaws.pdf.

19
COMPLAINT

Accepted LOA who has committed to make available a license for one or more Essential Patent Claims agrees that it shall neither seek nor seek to enforce a Prohibitive Order based on such Essential Patent Claim(s) in a jurisdiction against an implementer who is willing to negotiate in good faith for a license."[22]

### C.  Huawei's RAND Commitments to the IEEE

72.  On information and belief, Huawei participated in the development and implementation of Wi-Fi industry standards through its membership and participation in IEEE. Huawei personnel have participated for years in IEEE's standard working groups. Dr. Osama Aboul-Magd of Huawei currently participates or has participated in the IEEE 802.11ax (Wi-Fi 6) standard working group and the IEEE 802.11ac (Wi-Fi 5) standard working group. Xun Yang of Huawei currently participates or has participated in the IEEE 802.11ac (Wi-Fi 5) standard working group. On information and belief, other Huawei, Futurewei, Huawei Device USA, and/or Huawei USA personnel currently participate or have participated in relevant IEEE standard working groups, including Ming Gan, Yunbo Li, Xun Yang, and Edward Au.

73.  Huawei undertook specific obligations to IEEE to license its purportedly essential patents on RAND terms and conditions. Huawei, including related entities, affiliates, and successors- and predecessors-in-interest, are obligated by these RAND commitments. Huawei submitted LOAs, which promised to license its patents on RAND terms and conditions. On information and belief, as a result of Huawei's IPR disclosures, Huawei's alleged SEP technology was incorporated into the 802.11 standards, and other alternative technologies that might otherwise have been considered for inclusion in the standard were not adopted.

74.  Huawei and/or its predecessors entered into express and/or implied contracts with -the IEEE, to which the IEEE members and other third parties, such as implementers and users of 802.11 products, are third-party beneficiaries. By

---

[22] *Id*. at 18.

COMPLAINT

participating in the IEEE, Huawei agreed, among other things, to abide by the IEEE's policies and rules and Huawei's statements and LOAs to the IEEE. Huawei made an irrevocable guarantee to the IEEE on multiple occasions to grant RAND licenses to its SEPs. *See* Table 2.

**TABLE 2**

| Standard No. | LOA Date[23] | Huawei's Commitment |
|---|---|---|
| 802.11n/s/u | 6 Jan 2007 | "The Patent Holder will grant a license under reasonable rates to an unrestricted number of applicants on a worldwide, non-discriminatory basis with reasonable terms and conditions to comply with the [Proposed] IEEE Standard." |
| 802.11i/ac/ah/ai | 13 Aug 2013 | "The Submitter will grant a license under reasonable rates to an unrestricted number of applicants on a worldwide basis with reasonable terms and conditions that are demonstrably free of unfair discrimination." |
| 802.11ax/ay/aj/ba | 28 May 2019 | "The Submitter is unwilling or unable to grant licenses" without compensation or under reasonable rates "or to agree that it will not enforce its Essential Patent Claims…" |
| 802.11ax/aj | 25 Jul 2019 | "The Submitter will grant a license under reasonable rates to an unrestricted number of applicants on a worldwide basis with reasonable terms and conditions that are demonstrably free of unfair discrimination." |
| 802.11-1997, 802.11-1999, 802.11-2007, 802.11-2012, 802.11-2016 | 25 Jul 2019 | "The Submitter will grant a license under reasonable rates to an unrestricted number of applicants on a worldwide basis with reasonable terms and conditions that are demonstrably free of unfair discrimination." |

### 1. The Pre-Wi-Fi 6 LOAs

75. Huawei's January 2007 and August 2013 LOAs ("Pre-Wi-Fi 6 LOAs") were addressed to Secretary, IEEE-SA, Standards Board Patent Committee, Institute of Electrical and Electronics Engineers, Inc., 445 Hoes Lane, Piscataway, NJ 08854 USA, FAX(+1 732-875-0524), email: patcom@ieee.org and PatCom Administrator,

---

[23] Exs. A (6 Jan 2007), B (13 Aug 2013), C (28 May 2019), D (25 Jul 2019), E (25 Jul 2019).

21
COMPLAINT

IEEE-SA, Standards Board Patent Committee, Institute of Electrical and Electronics Engineers, Inc., 445 Hoes Lane, Piscataway, NJ 08854 USA, FAX(+1 732-875-0524), email: patcom@ieee.org, respectively. On information and belief, the Pre-Wi-Fi 6 LOAs were sent to this address in the United States using U.S. Postal Service or private commercial interstate or foreign carrier, or use of electronic means of communication such as fax or the Internet.

76.    As shown above in Table 2, in January 2007, Huawei submitted a LOA covering Wi-Fi standards 802.11n/s/u and agreed "to grant a license under reasonable rates to an unrestricted number of applicants on a worldwide, non-discriminatory basis with reasonable terms and conditions." The LOA states that "[t]his assurance applies from the date of the standard's approval to the date of the standard's withdrawal and is irrevocable upon acceptance by the IEEE-SA Standards Board Patent Committee."

77.    The January 2007 LOA was signed by Wei Kang, Huawei Technologies Co., Ltd., Director of Licensing, Intellectual Property Department, Administration Building, Huawei Campus, Longgang District, Shenzhen, 518129 P.R. China. On information and belief, the January 2007 LOA was accepted by the IEEE on January 9, 2007.

78.    As shown above in Table 2, in August 2013, Huawei submitted a LOA covering Wi-Fi standards 802.11i/ac/ah/ai and agreed to "grant a license under reasonable rates to an unrestricted number of applicants on a worldwide basis with reasonable terms and conditions that are demonstrably free of unfair discrimination." The LOA states that "[t]his assurance applies from the date of the standard's approval to the date of the standard's transfer to inactive status and is irrevocable upon acceptance by IEEE-SA."

79.    The August 2013 LOA is a Blanket Letter of Assurance, and "[a]s such, all Essential Patent Claims that the Submitter may currently or in the future have the ability to license shall be available under the terms as indicated above."

80.    The August 2013 LOA was signed by Wei Kang, Huawei Technologies

Co., Ltd., Director of Licensing, Intellectual Property Department, Administration Building, Bantian Longgang District, Shenzhen, 518129 P.R. China. On information and belief, the August 2013 LOA was accepted by the IEEE on August 13, 2013.

### 2.  The Wi-Fi 6 LOAs

81.  The May and July 2019 LOAs ("Wi-Fi 6 LOAs") were addressed to PatCom Administrator, IEEE-SA Standards Board Patent Committee, Institute of Electrical and Electronics Engineers, Inc., 445 Hoes Lane, Piscataway, NJ 08854 USA, FAX (+1 732-875-0524), email: patcom@ieee.org. On information and belief, the Wi-Fi 6 LOAs were sent to this address in the United States using U.S. Postal Service or private commercial interstate or foreign carrier, or use of electronic means of communication such as fax or the Internet.

82.  As shown in Table 2, in May 2019, Huawei submitted a LOA covering Wi-Fi standards 802.11aj, 802.11ax, 802.11ay, and 802.11ba and providing that "[t]he Submitter is unwilling or unable to grant licenses . . . or to agree that it will not enforce its Essential Patent Claims." The May 2019 LOA explicitly states that "[t]his assurance applies, at a minimum, from the date of the standard's approval to the date of the standard's transfer to inactive status and is irrevocable upon acceptance by the IEEE-SA." On information and belief, the May 2019 LOA was accepted by the IEEE on May 30, 2019.

83.  On July 25, 2019, Huawei submitted two LOAs covering Wi-Fi standards 802.11aj, 802.11ax, 802.11-1997, 802.11-1999, 802.11-2007, 802.11-2012, and 802.11-2016 and reversed course on its previous submission, now providing a statement that it will "grant a license under reasonable rates to an unrestricted number of applicants on a worldwide basis with reasonable terms and conditions that are demonstrably free of unfair discrimination." The July 2019 LOAs explicitly state that "[t]his assurance applies from the date of the standard's approval to the date of the standard's transfer to inactive status and is irrevocable upon acceptance by the IEEE-SA." The July 2019 LOAs were "Limited" LOAs and provided a section at the end of

23<br>COMPLAINT

Definitions, which stated, "[s]hould any discrepancy exist between the definitions above and the definitions in the IEEE-SA Standards Board Bylaws clause 6.1, the definitions contained in the Bylaws in effect as of 14 March 2015 shall control." On information and belief, the July 2019 LOAs were accepted by IEEE on July 25, 2019.

84.    The Wi-Fi 6 LOAs further identified each letter as a Blanket Letter of Assurance and "[a]s such, all Essential Patent Claims that the Submitter may currently or in the future have the ability to license shall be available under the terms as indicated above."

85.    The Wi-Fi 6 LOAs were signed by Wang Xin, IP Manager Huawei Technologies Co., Ltd., Administration Building, Huawei Base, Bantian, Longgang District, Shenzhen, P.R. China 518129.

### D.    Huawei's Obligation to Grant a RAND License

86.    Because Huawei has asserted that its patents are "essential" in LOAs, including LOAs with a Blanket Declaration, companies like NETGEAR that relied on Huawei's commitments are entitled to the benefits of a RAND license. As Huawei recognized in its 2012 litigation with InterDigital, "a FRAND obligation requires more than good faith efforts, and actually requires an SEP holder to grant FRAND licenses." [24] Huawei further recognized that RAND-committed patents could be declared "void and unenforceable," where the patent holder initiated litigation against a party without proposing RAND terms.[25]

87.    In a 2013 letter to the United States District Court for the District of Delaware, Huawei recognized that "exclusionary or injunctive relief . . . should follow only after adjudicated or arbitrated FRAND terms are set, and refused."[26]

---

[24] *Certain Wireless Devices with 3G Capabilities and Components Thereof*, No. 337-TA-800, Respondents' July 15, 2013 Petition for Review (Public Version) at 92.

[25] *Certain Wireless Devices with 3G Capabilities and Components Thereof*, No. 337-TA-800, Huawei Techs. Co., Ltd. Response to the Third Amended Complaint at 168.

[26] *InterDigital Commc'ns Inc. v. Huawei Techs. Co., Ltd.*, No. 1:13-cv-00008-RGA, Dkt. 12 (D. Del. Jan. 29, 2013).

24
COMPLAINT

88.    In a 2013 submission to the U.S. International Trade Commission, Huawei outlined the "harm [to] competitive conditions in the U.S. economy" of an exclusion order on RAND-committed patents.[27] Huawei identified this harm as:

> A. "**Harm to innovation.** Threatened exclusion orders encourage royalty demands by SEP holders that reduce expected returns to investment by others, including complementary SEP holders. Both actual exclusion and excessive bargaining power undermine incentives for innovation in a host of complementary technologies, services and products—patented and not— especially if the most successful licensees are targeted."
>
> B. "**Loss of consumer welfare from inflated royalties.** Holdup power based on threatened exclusion orders biases bargaining power in favor of SEP holders. Resulting terms and royalties are detached from the contribution of the patented technology and may well exceed reasonable levels. Excessive royalties directly harm implementers, and also harm downstream consumers when royalties are passed through to consumers."
>
> C. "**Slowdown and compromise of standards process.** Holdup power created by the threat of exclusion orders strengthens the "vested interest" incentive to maneuver to get one's patented technology into the standard and to resist the inclusion of others' patented technologies, regardless of technological merits. This conflict is likely to exacerbate delays in the consensus standards process, and to make it harder for SSOs to choose the technically best solutions."

89.    In *Huawei v. ZTE,* the Court of Justice of the European Union in 2015 defined several steps that should be followed in an attempt to outline reasonable and non-discriminatory dealings in the context of standard essential patent licensing.[28] For example, the CJEU ruled that the holder of a standard essential patent that has committed to license SEPs on FRAND terms may be found in breach of the competition rules (Article 102 TFEU) by seeking an injunction against a potential licensee in certain circumstances. In doing so, the CJEU defined several steps that should be followed in SEP patent licensing negotiations:

---

[27] *Certain Wireless Devices with 3G Capabilities and Components Thereof*, No. 337-TA-800, Huawei's August 8, 2013 Statement on the Public Interest (Public Version) at 3-4.

[28] *Huawei Techs. Co., Ltd. v. ZTE Corp.*, No. C-170/13, Court of Justice of the European Union, July 16, 2015, https://curia.europa.eu/juris/document/document.jsf?doclang=EN&text=&pageIndex=1&part=1&mode=lst&docid=165911&occ=first&dir=&cid=3858.

1. The SEP holder must alert the implementer in writing of the infringement complained of by noting the relevant SEP and how it is alleged to be infringed;

2. The implementer must express a willingness to conclude a licensing agreement on FRAND terms;

3. The SEP holder must provide a specific, written offer for a license on FRAND terms;

4. The implementer must "diligently" respond to that offer, in accordance with recognized commercial practices and in good faith;

5. If the implementer does not accept the offer made to it, a counteroffer that corresponds to FRAND terms must be made promptly and in writing to the SEP holder;

6. If the implementer is using the teachings of the SEP before a licensing agreement has been concluded, the implementer must provide appropriate security in respect of its past and future use of the SEP;

7. Where an agreement has not been reached on the details of the FRAND terms following the counter-offer by the implementer, the parties may, by agreement, request that the amount of the royalty be determined by an independent third party; and

8. The implementer cannot be criticized for challenging, in parallel to negotiations for a grant of license, the validity of the SEP or the essential nature of the SEP or for reserving the right to do so in the future.

90.     In a January 2016 litigation in the United Kingdom against Unwired Planet, Huawei described the limitations on seeking an injunction for SEPs: an "SEP holder should not seek an injunction against a willing licensee, nor should the threat of an injunction be used as a means to extract higher royalties and/or other concessions from a locked-in implementer of a standard."[29]

91.     In the Unwired Planet litigation, Huawei further recognized that "it is wholly inconsistent both with the express terms of the FRAND undertaking and with its underlying purpose for a SEP owner to refuse to license an SEP unless the licensee also takes a license under all of the SEP owner's other telecommunications patents (whether SEPs and non-SEPs or just SEPs) on a global 'all or nothing' basis."

92.     The Federal Trade Commission ("FTC") has recognized that SSO

---

[29] *Unwired Planet Int'l Ltd. v. Huawei Tech. Co. Ltd.*, No. HP-2014-000005 (EWHC).

COMPLAINT

misconduct violates Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act"). The FTC has recognized that threatening or obtaining injunctions on FRAND-committed patents against willing licensees violates Section 5 of the FTC Act. For example, in a complaint against Google and Motorola Mobility for violations of Section 5 of the FTC Act, the FTC alleged the following conduct by Google:[30]

> [T]he Commission challenges a course of conduct, whereby Google, and its predecessor in interest, Motorola Mobility, Inc. ("Motorola"), engaged in unfair methods of competition by breaching its commitments to standard-setting organizations (SSOs") to license its standard essential patents ("SEPs") on fair, reasonable, and nondiscriminatory ("FRAND") terms. Google violated its FRAND commitments by seeking to enjoin and exclude willing licensees of its FRAND-encumbered SEPs.

93.     Regarding the consent order, the FTC further stated:[31]

> Under this Order, before seeking an injunction on FRAND-encumbered SEPs, Google must: (1) Provide a potential licensee with a written offer containing all of the material license terms necessary to license its SEPs, and (2) provide a potential licensee with an offer of binding arbitration to determine the terms of license that are not agreed upon. Furthermore, if a potential licensee seeks judicial relief for a FRAND determination, Google must not seek an injunction during the pendency of the proceeding, including appeals.

94.     In this Circuit, courts have protected an implementer's right to obtain a license at a FRAND rate without the coercive threat of an injunction. For example, the United States District Court in the Western District of Washington enjoined Motorola from enforcing an injunction entered in Germany pending the resolution of FRAND terms.[32] The Ninth Circuit stated in that case: "Implicit in such a sweeping promise [to license on FRAND terms] is, at least arguably, a guarantee that the patent holder will not take steps to keep would-be users from using the patented material, such as seeking an injunction, but will instead proffer licenses consistent with the

---

[30] *In the Matter of Motorola Mobility LLC and Google Inc.*, No. C-4410, Complaint, Federal Trade Commission, July 23, 2013.

[31] 78 Fed. Reg. 2398, 2401 (Jan. 11, 2013).

[32] *See Microsoft Corp. v. Motorola, Inc.*, 871 F.Supp.2d 1089 (W.D. Wash. May 14, 2012).

commitment made."[33]

95.     RAND obligations are important to the RAND ecosystem because, in the process of developing standards, participants choose a particular technology to provide each function within the standard. Participants evaluate whether to standardize particular proposed functionalities and, if so, which viable, alternative competing technologies to select to perform those functionalities. Once a standard is adopted, the viability of using alternative technologies is eliminated. Standardization thus eliminates as substitutes all the technologies that were capable of performing the functionality in the standard, but that were not chosen to be included. Parties supplying products that support a standard, like NETGEAR, thus become "locked-in" to the standardized technology.

96.     To the extent Huawei is correct that its patented technologies are essential to Wi-Fi standards and other standards, Huawei has the power to raise prices and exclude competition with respect to each of the technologies covered by its patents and incorporated in the relevant standard, particularly if it does not satisfy its contractual obligation to negotiate in good faith a RAND license. Huawei possesses "hold-up" power because, without a license, a party using the standard risks the threat of an injunction that could put its entire business at risk. Moreover, because many companies often contribute to the standard-setting process, the agreement to provide RAND license terms is important because supracompetitive rates, when contemplated in the scenario of numerous potential licensors for a standard, would significantly damage the ability of implementers, like NETGEAR, to provide necessary products at a fair price, thus harming societal interests and the economy.

97.     This hold-up power can be exacerbated when a company like Huawei has amassed a large portfolio of patents. According to a report Huawei provided to NETGEAR, Huawei claims it is the second largest Wi-Fi 6 SEP holder with 122 Wi-

---

[33] *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 884 (9th Cir. 2012)

Fi 6 SEP patent families accounting for 18.9% of the overall Wi-Fi 6 SEP families. Huawei further claims it holds the largest number of OFDMA-related Wi-Fi 6 SEP patent families, having 83 OFDMA-related Wi-Fi 6 SEP families accounting for 21.8% of the OFDMA-related Wi-Fi 6 SEP families. Huawei provided NETGEAR with another report claiming that Huawei made the largest number of contributions ███████████ to the Wi-Fi 5 standard. Huawei first came to NETGEAR with a list of 1800 patents it claims relate to Wi-Fi.

98.     By refusing to fairly license purported SEPs individually and engaging in serial litigation tactics and "all-or-nothing" approaches to proposed licensing, companies like Huawei can amplify the hold-up threat of SEPs and violate the premise of a RAND obligation. When non-RAND terms and conditions are proposed, and a party like Huawei refuses to engage in the "give and take" negotiation process contemplated by RAND, a would-be licensee is faced with the prospect of either acceding to non-RAND, portfolio-wide demands at exorbitant royalty rates or risking serial litigation and an injunction crippling its business. Left unconstrained, owners of SEPs can take advantage of lock-in and demand exorbitant royalties and other terms, as Huawei has done here and continues to do.

99.     RAND policy thus seeks to prevent this "hold-up" power of an SEP holder by ensuring the availability of licenses on fair, reasonable and non-discriminatory terms. RAND policy and the fairness enveloping that policy ensures that an SEP holder cannot dominate the market, and companies that are "locked-in" can continue their business under fair and reasonable terms.

100.   The commitment to fair and non-discriminatory licensing is enhanced by critical transparency requirements concerning the applicable licensing conditions that exist for the parties. Throughout the RAND negotiation process, both parties should negotiate transparently and in good faith based on an exchange of relevant information. Because the royalty must be "nondiscriminatory" as well as fair and reasonable, the SEP holder should disclose to the implementer information about

existing licenses with other licensees it claims are "comparable" and support its alleged RAND royalty with facts that can be fairly analyzed by proposed licensees.

### E. Huawei's Negotiations with NETGEAR and Refusal to Comply with Its RAND Obligations

101.  Although Huawei committed to the IEEE to license its Wi-Fi SEPs on RAND terms and conditions, Huawei violated its commitments by seeking to enjoin or exclude NETGEAR, a willing licensee, from practicing the Wi-Fi standard and by failing to offer and grant RAND terms and conditions for licensing of any Huawei Wi-Fi SEPs. By virtue of its RAND commitments, Huawei effectively agreed to forego exclusionary and injunctive relief against parties like NETGEAR that are willing to agree to RAND license terms with respect to any valid and essential patents they use.

102.  Here, Huawei's concealment of its true intention not to offer RAND terms and conditions to all those implementing the standard—despite its prior written commitments to the contrary—induced the IEEE to standardize the technology that Huawei claims is covered by Huawei's patents. Huawei's representations in its LOAs and promise to license its allegedly essential patents on RAND terms and conditions were intentionally false and misleading. On information and belief, Huawei had no intention of licensing its alleged SEPs on RAND terms. Instead, Huawei and its affiliates knowingly planned to use false statements and assurances to the IEEE to later obtain exorbitant licensing rates or injunctions from companies like NETGEAR who were "locked in," by using its improperly gained "hold up" power with the purpose of dominating global markets through anti-competitive and unfair tactics.

103.  In a press release dated June 11, 2020, that has since been withdrawn, Huawei stated that despite its refusal to abide by the IEEE 2015 policy, it has been a willing licensor of its 802.11 SEPs under the IEEE's 2007 policy: "Since it submitted its first Letter of Assurance ("LOA") with respect to the 802.11 standard in 2007, Huawei has been committed to license its Essential Patent Claims with respect to the 802.11 standards under Reasonable Rates in compliance with the [2007] version of the

IEEE-SA Standards Board Bylaws. . . . Huawei has, however, previously announced publicly that, despite its decision not to provide licensing commitments under the 2015 Policy, it remains willing to license its Essential Patent Claims in accordance with the 2007 Policy."[34]

104.   By providing the LOA to IEEE and issuing the June 2020 press release, Huawei knowingly made a false promise that it would license its alleged Wi-Fi SEP technology on RAND terms and conditions to induce the adoption of its technology in the Wi-Fi standards and in products worldwide.

105.   Huawei concealed from the IEEE its true intention to not offer RAND license terms for each of the alleged Wi-Fi SEPs. Had the IEEE known of Huawei's intent, the IEEE would have standardized an alternative technology or left the function out of the standard. In either case, implementers would have been free to choose an alternative technology, and Huawei's alleged SEP technology would not be incorporated in NETGEAR's or other companies' products.

106.   Unaware of Huawei's true intention not to offer RAND license terms, NETGEAR and other implementers invested substantial resources in developing products in compliance with the IEEE standards, including the Wi-Fi 6 standard. NETGEAR and other implementers relied on Huawei to submit honest LOAs and to expressly identify any patents they do not commit to license free of charge or on RAND terms and conditions.

107.   NETGEAR necessarily relied on Huawei and other patent holders' participation in the development of the IEEE standards that licenses would be available to any SEPs held by patent holders and their assignees on RAND terms. NETGEAR and other implementers of the Wi-Fi standards rely on the integrity of the standard development process, including the submission of LOAs, in order to ensure

[34]*Huawei Reaffirms Licensing Commitment Regarding Certain IEEE Standards*, Huawei Techs. Co., Ltd. (June 11, 2020), https://web.archive.org/web/20230605095837/https://www.huawei.com/ie/declarations/huawei-reaffirms-licensing-commitment-regarding-ieee-2020.

31
COMPLAINT

that they may implement standards by licensing any essential patents without risk of litigation and on RAND terms and conditions. NETGEAR and other implementers of the Wi-Fi standards rely on participants in the development of the standards to submit LOAs and identify any patents they do not commit to license at no cost or on RAND terms and conditions.

108.    Huawei's conduct and promises, including, without limitation, its July 2019 LOA offering a Wi-Fi 6 license on RAND terms and other LOAs, created express and/or implied contracts with the IEEE and/or its members, to which IEEE members and other third parties such as suppliers and users of 802.11 products are third-party beneficiaries. Huawei is, therefore, bound by its commitments to provide licenses and negotiate in good faith with third parties, including NETGEAR, on RAND terms.

109.    Huawei's actions show that it never intended to comply with its promises to license its allegedly essential patents on RAND terms and conditions. To that end, Huawei has refused to engage with NETGEAR in good-faith efforts to determine RAND terms and conditions for its alleged Wi-Fi SEPs. Instead, Huawei insists that NETGEAR pay royalty rates significantly higher than justified for invalid and unenforceable patents while at the same time refusing to provide comparable licenses or other information to assist NETGEAR in fairly assessing the value, if any, of Huawei SEPs.

110.    At all relevant times, Huawei was well aware of its RAND obligations. Despite possessing such knowledge, Huawei refused to grant NETGEAR a RAND license to its Wi-Fi 6 or Pre-Wi-Fi 6 portfolios and/or to engage in negotiations likely to lead to a truly RAND license. This un-RAND conduct violates Huawei's obligations to provide NETGEAR with a license under RAND terms and conditions as required by the IEEE.

111.    As discussed above, by virtue of its RAND commitments, Huawei effectively agreed to forego exclusionary and injunctive relief against parties willing

32
COMPLAINT

to agree to RAND license terms with respect to valid and essential patents they use. Yet, before and during the parties' negotiations, Huawei serially filed the lawsuits shown in Table 3 seeking injunctive relief.

**TABLE 3**

| Court (Filing Date) | Case No. | Patent No. |
|---|---|---|
| German Regional Court Düsseldorf (March 2, 2022) | 4c O 8/22 | EP 3 337 077 |
| German Regional Court Düsseldorf (March 2, 2022) | 4c O 9/22 | EP 3 143 741 |
| Jinan Intermediate People's Court of China (May 10, 2022) | (2022) Lu 01 Zhi Min Chu No. 407 | ZL 201811536087.9 |
| Jinan Intermediate People's Court of China (May 10, 2022) | (2022) Lu 01 Zhi Min Chu No. 408 | ZL 201810757332.2 |
| Unified Patent Court ("UPC") Local Division Munich (July 3, 2023) | 459771/2023 | EP 3 611 989 |
| UPC Local Division Munich (November 23, 2023) | 459771/2023 (extension) | EP 3 678 321 |

112. The history of negotiations between the parties does not reflect reasonable licensing conduct by Huawei. Huawei first contacted NETGEAR on July 9, 2020, through a letter sent via email and express mail to the Chairman and Chief Executive Officer of NETGEAR, Inc. in the United States. The letter stated, "[t]his letter serves as a formal notice letter of infringement of Huawei's standard essential patents to 802.11 series standards ('Wi-Fi Standards') by Netgear's products." This letter contained only a general reference to Huawei's "Wi-Fi patent portfolio," with an attached 91-page list of "exemplary patents" and without stating the particular Wi-Fi standard for which Huawei believed its patents to be essential, without identifying

even one patent that Huawei believed to be infringed, and without providing any information as to why NETGEAR might require a license. The communication contained no reference to a RAND offer and failed to provide any terms or conditions whatsoever.

113.   In the letter, (i) Huawei asked NETGEAR to discuss licensing of Huawei's Wi-Fi patent portfolio, (ii) Huawei identified a list of NETGEAR's products supporting Wi-Fi standards including NETGEAR's Wi-Fi routers, Orbi Wi-Fi systems, mesh Wi-Fi systems, Nighthawk pro gaming routers, digital canvas series products, Wi-Fi range extenders, DSL modems and routers, cable modems and routers, Wi-Fi adapters, powerline, mobile routers, hotspots, and LTE modems, (iii) Huawei identified a list of purportedly exemplary infringing products practicing the Wi-Fi standards including NIGHTHAWK® AX12 12-STREAM AX6000 WI-FI 6 ROUTER, NIGHTHAWK® AX8 8-STREAM AX6000 WI-FI 6 ROUTER, Orbi Wi-Fi 6 System, NIGHTHAWK® MESH WI-FI 6 SYSTEM, NETGEAR Nighthawk Pro Gaming AD7200 Wi-Fi Router, Orbi Outdoor Wi-Fi Range Extender, N750 Wi-Fi DSL Modem Router, Nighthawk® AC1900 Wi-Fi USB Adapter, and PowerLINE Wi-Fi 1000, and NIGHTHAWK® M1 MOBILE ROUTER, and (iv) Huawei identified a list of 1800 Huawei patents. The NETGEAR products identified herein are referred to as the "NETGEAR Products."

114.   On August 14, 2020, Huawei sent a second letter to the Chairman and Chief Executive Officer of NETGEAR, Inc. in the United States. The letter was again sent via express mail and email, copying NETGEAR's United States counsel located in California and Huawei's United States Chief Intellectual Property Counsel with a futurewei.com email address. On information and belief, Huawei's United States Chief Intellectual Property Counsel at the time was located in Texas, and employed by Futurewei and/or Huawei USA.[35] This second letter referenced Huawei's "list of more

---

[35] *See* Randall Colburn, *East Meets West*, Modern Counsel (Mar. 15, 2018) https://modern-counsel.com/2018/huawei/ (identifying Huawei's Chief Intellectual

34

than 1800 Wi-Fi patents," without stating which patents could be standard essential, without providing any information regarding purported infringement, without identifying which of the patents NETGEAR should focus on in any RAND analysis, and without providing any terms and conditions whatsoever regarding a potential RAND license.

115.   Additional similar letters were sent in 2020 to the United States, copying the same persons from NETGEAR and Futurewei and/or Huawei USA in the United States. No Huawei letter mentioned any specific standard to which the patents allegedly relate, and no letter provided information concerning potential infringement or why NETGEAR might need a license. Again, none of these letters provided a RAND license offer or any information whatsoever that would assist in purported RAND negotiations.

116.   On November 22, 2021, almost a year later, Huawei reached out to NETGEAR in the United States via email, but this time claiming that NETGEAR was making use of Huawei's alleged 4G and 5G patent portfolio. This email contained no further information regarding the alleged use of Huawei's Wi-Fi SEPs and again provided no information indicative of RAND negotiations.

117.   Up to this point in time, Huawei sent seven such emails and/or letters directed to NETGEAR personnel located in the United States. And, despite Huawei's failure to provide NETGEAR with a RAND offer, it demanded that NETGEAR stop making, manufacturing, using, offering to sell and selling Wi-Fi-enabled products that infringe any Huawei patent.

118.   Huawei first indicated a desire to negotiate a license to its Wi-Fi 6 patent portfolio almost two years after initial contact with NETGEAR was made through an April 4, 2022 email to NETGEAR's United States CEO, COO, CTO and counsel in California, amongst others. By this date, however, Huawei had already filed two

Property Counsel as employed by Huawei Technologies in Texas).

35

actions on March 2, 2022 in Germany seeking an injunction. Huawei changed course, contending for the first time in approximately two years of communications that it is "trying to engage with NETGEAR to negotiate a license for the Wi-Fi 6 standard essential patents ('SEP') license on fair, reasonable and non-discriminatory terms ('FRAND')" and it is "willing to grant a license to NETGEAR on FRAND terms."

119. On May 10, 2022, Huawei filed another two complaints in the Jinan Intermediate People's Court of China, alleging that NETGEAR's Wi-Fi 6 products violated its two Chinese patents, ZL201811536087.9 and ZL201810757332.2.

120. On June 16, 2022, Huawei provided ████████████████████ ████████████████████████████████████ via email to NETGEAR's counsel in the United States and Germany. ████████████████████ ████████████████████████████████ NETGEAR responded by asking for Huawei's assistance in the examination and evaluation of the portfolio by seeking an exemplary list of ten patents from the portfolio that Huawei claimed are particularly relevant to NETGEAR's products. ████████████████ ████████████████████████████████ ████████████████████

121. Huawei failed to provide any offer of alleged RAND terms until June 25, 2022. Huawei's offer was ████████████████████████ ████████████████████████████████████ Even though the parties entered a non-disclosure agreement ("NDA") on May 27, 2022, this offer contained only rudimentary information concerning ████████ ████████████████████████████████ for Wi-Fi 6. NETGEAR responded by requesting Huawei provide all third-party licenses, which include a license under Huawei's Wi-Fi 6 and/or Wi-Fi 5 SEPs, but Huawei refused to provide this information.

122. NETGEAR expressed its willingness to license on RAND terms in a letter dated April 12, 2022 and again at least on August 30, 2022, September 22, 2022,

and October 14, 2022. On September 22, 2022, NETGEAR explained that it needed a mechanism for assigning a RAND value, such as the comparable licenses and agreements that Huawei was withholding. Without having information concerning comparable licenses that Huawei had previously entered into for the same purportedly standard essential patents, NETGEAR could not evaluate the reasonableness of Huawei's offer to NETGEAR. NETGEAR also requested technical meetings to understand whether the charted patents were essential. On October 14, 2022, NETGEAR reiterated its need to review Huawei's licenses because it had no relevant information to assign a fair value to Huawei's portfolio or to assess the reasonableness or non-discriminatory nature of Huawei's offer.

123.   On October 31, 2022, NETGEAR wrote to Huawei again and explained that it needed to know why Huawei was contending that its patents were SEP for Wi-Fi 6. NETGEAR explained that it required further information concerning specific patents that Huawei claimed to be essential. NETGEAR further explained that ████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████

124.   NETGEAR reiterated its "request for a license under Huawei's true SEP for the Wi-Fi 6 standard which is in accordance with Huawei's obligations under the IEEE-SA LOA dated 25 July 201[9] and meets the requirements under the applicable antitrust law. To foster the negotiation NETGEAR made considerable efforts to analyze at least a randomized sample of the patents offered for license…." Huawei yet again refused to specifically identify its Wi-Fi 6 SEPs, other than to contend it owns 18.9% of Wi-Fi 6 SEPs. This continued a long pattern of Huawei's refusal to provide information regarding which of its Wi-Fi patents were standard essential, while at the

same time seeking significant licensing fees for use of the purported essential patents that Huawei refused to disclose.

125.

126. Over the next several months, the parties reviewed

NETGEAR further provided a RAND counteroffer on May 1, 2023.

127. On May 4, 2023, the parties met to discuss NETGEAR's counteroffer. After the parties clarified various points regarding NETGEAR's counteroffer in June and July 2023 communications, Huawei sued NETGEAR on July 3, 2023, in the UPC for allegedly infringing EP 3611989 (a patent allegedly relating to Wi-Fi).

128. On July 7, 2023, presumably bolstered by its newest lawsuit, Huawei wrote to NETGEAR and countered NETGEAR's offer with an offer nearly identical to its initial offer

Huawei's counter-offer included a few minor concessions to NETGEAR but did not change the main points of Huawei's initial offer and thus reflected a "take it or leave it" approach to licensing rather than the reasonable and non-discriminatory terms that Huawei was contractually obligated to provide. Around this time, NETGEAR again requested Huawei's license agreements with several companies, and Huawei yet again refused to produce those agreements. NETGEAR explained that it did not believe that the two license agreements provided by Huawei were comparable and that it did not believe Huawei's offer was acceptable. On information and belief, Huawei's negotiation

tactics of refusing to provide relevant information while at the same time demanding royalty rates in a "take it or leave it" approach was intended to extract supracompetitive rates from NETGEAR under the mounting threat of serial lawsuits filed by Huawei.

129.    The parties again met virtually on August 31, 2023, to discuss various issues regarding both parties' offers. The parties continued negotiating into October 2023. Huawei steadfastly refused to lower its royalty demands throughout the process.

130.    As part of the parties' licensing negotiations, NETGEAR informed Huawei that NETGEAR purchased modem chipsets from Huawei's licensee, Qualcomm Incorporated ("Qualcomm"). NETGEAR identified the Huawei and Qualcomm settlement and long-term global patent cross-license agreement, which included granting Qualcomm rights to Huawei patents ("Qualcomm License").[36] According to the Essentiality Report on Wi-Fi 6 Patents (2021) by NGB that Huawei identified to NETGEAR, Qualcomm is the world's largest Wi-Fi 6 SEP holder, having 123 Wi-Fi 6 SEP families with 19.1% of the overall Wi-Fi 6 families. Also, according to Huawei, Qualcomm is the third largest SEP contributor to Wi-Fi 4 (with 114 contributions) and Wi-Fi 5 (with 137 contributions).

131.    NETGEAR further informed Huawei that NETGEAR believed that NETGEAR had rights to patents falling under the Qualcomm License, that asserting any such patents and seeking a RAND license for such patents would violate the Qualcomm License and be unreasonable conduct, and that Qualcomm's sales of chips to NETGEAR exhausted Huawei's rights in patents that Huawei claimed NETGEAR required a license to.

132.    Huawei refused to provide NETGEAR with a copy of the Qualcomm

---

[36] *See, e.g., Qualcomm Announces Third Quarter Fiscal 2020 Results* (July 29, 2020), https://investor.qualcomm.com/financial-information/sec-filings/content/0001728949-20-000056/qcom062820erex991.htm (announcing agreement); *Qualcomm Technology Licensing*, https://www.qualcomm.com/licensing#licensee-search (last visited Jan. 19, 2024) (Qualcomm's website identifying Huawei as a license).

License or any information helpful to evaluate the rights that NETGEAR held through the Qualcomm License.

133. Thereafter, in June 2023, NETGEAR initiated Section 1782 proceedings under United States law in the District Court for the Southern District of California seeking discovery from Qualcomm, *i.e.*, the Qualcomm License, for use in the German proceedings.[37] After NETGEAR informed Huawei of the 1782 proceeding, Huawei continued to refuse to provide any additional license or settlement agreements. NETGEAR continued to express a willingness to take a RAND license, and Huawei continued its failure to comply with its RAND obligations by refusing to provide necessary information, refusing to identify essential patents for evaluation, and refusing to negotiate at all with regard to the exorbitant licensing rate established by Huawei without reference to any of the facts pertaining to NETGEAR. Huawei has also failed to make any RAND offer that accounts for the Qualcomm License.

134. On November 23, 2023, Huawei filed yet another UPC case against NETGEAR by filing what it deemed to be an "extension" of its UPC complaint by adding EP 3678321 (a patent allegedly relating to Wi-Fi).

135. A partial default judgment was issued against NETGEAR on September 27, 2022, in the 4c O 8/22 case in the Regional Court Dusseldorf due to missed service. Following this default judgment, and because Huawei is seeking an injunction for a Germany-wide sales ban, ███████████████████████████████ ██████████████████████████. After the patent was preliminarily found to be invalid, the German court stayed enforcement of the default decision in March 2023, and ███████████████████████████████████████████

136. NETGEAR, at all times, has remained a willing licensee for Huawei's purported SEPs and continues to negotiate in good faith. Despite NETGEAR's

---

[37] *In Re Ex Parte Application of Netgear Inc. and Netgear Deutschland GMBH for an Order pursuant to 28 USC 1782 to obtain discovery for use in foreign proceedings*, No. 3:23-MC-00794 (S.D. Cal. June 14, 2023).

40

COMPLAINT

willingness to license on RAND terms, Huawei continues to serially pursue litigation in Germany, the UPC, and China, including seeking injunctive relief, notwithstanding the negative results Huawei has already encountered in the German proceedings. Huawei's ruthless assault has damaged and tarnished NETGEAR's reputation globally, and NETGEAR has incurred significant lost business, reputational damages and litigation fees and costs to defend Huawei's allegations.

137.   Huawei has failed to provide standard terms for a RAND license consistent with IEEE policy and general RAND principles and has proceeded with litigation in violation of its RAND obligations, including but not limited to seeking an injunction in Germany, the UPC, and China.

**F.     Huawei's Schemes and Pattern of Racketeering Activity through a RICO Enterprise**

138.   Since at least in or about 2000, Huawei and others, including Futurewei, Huawei Device USA, and Huawei USA, executed illegal schemes and a pattern of racketeering activity to operate and grow the worldwide business of Huawei and its parents, global affiliates and subsidiaries through unfair and unlawful conduct, including the deliberate and repeated misappropriation of intellectual property and intellectual property rights, targeted at companies headquartered or with offices in the United States that engage in interstate and foreign commerce.

139.   Huawei and its affiliates and subsidiaries have engaged in a worldwide pattern and scheme to unlawfully manipulate and dominate global markets. As set forth below, Huawei is conducting this pattern and scheme through, among other things, fraud, deceit, misappropriation, and other forms of unfair and unlawful conduct involving intellectual property rights. As FBI Director Christopher Wray stated in 2020, "[t]he allegations are clear: Huawei is a serial intellectual property thief, with a pattern and practice of disregarding both the rule of law and the rights of its victims."[38]

---

[38] Christopher Wray, Dir., Fed. Bureau of Investigation, The Threat Posed by the Chinese Government and the Chinese Communist Party to the Economic and National

41
COMPLAINT

140.    Huawei has a known culture and drive to grow its global business at all costs, according to The New York Times reporting on Huawei's "wolf culture" in 2018.[39] The "company's aggressive ways have been cast in a new light," as the "United States accused Meng Wanzhou, a top Huawei executive and daughter of its founder, of committing bank fraud to help the company's business in Iran." The New York Times reported that "Huawei workers have been accused of bribing government officials to win business in Africa, copying an American competitor's source code and even stealing the fingertip of a robot in a T-Mobile lab in Bellevue, Wash." The New York Times reported that workers do not pay attention to rules and controls because "Huawei used to evaluate staff solely according to how much business they won." Mr. Ren Zhengfei, Huawei's founder and chief executive, was quoted as saying that even though it was important to enforce internal standards, "[i]f it blocks the business from producing grain, then we all starve to death…."

141.    It was reported that in 2013, "Huawei China launched a formal policy of awarding bonuses to employees who stole confidential information from competitors."[40]

142.    In 2018, Mr. Ren was quoted as telling Huawei employees to "surge forward, killing as you go, to blaze us a trail of blood" in Huawei's battle for global supremacy.[41] As FBI Director Christopher Wray stated in 2020 about this

Security of the United States (July 7, 2020), https://www.fbi.gov/news/speeches/the-threat-posed-by-the-chinese-government-and-the-chinese-communist-party-to-the-economic-and-national-security-of-the-united-states.

[39] Raymond Zhong, *Huawei's 'Wolf Culture' Helped It Grow, and Got It Into Trouble*, New York Times (Dec. 18, 2018), https://www.nytimes.com/2018/12/18/technology/huawei-workers-iran-sanctions.html.

[40] Laurel Wamsely, A Robot Named 'Tappy': Huawei Conspired to Steal T-Mobile's Trade Secrets, Says DOJ, NPR (Jan. 29, 2019), https://www.npr.org/2019/01/29/689663720/a-robot-named-tappy-huawei-conspired-to-steal-t-mobile-s-trade-secrets-says-doj.

[41] Dan Strumpf, *Huawei Founder Ren Zhengfei Takes Off the Gloves in Fight Against U.S.*, Wall Street Journal (June 6, 2020 12:00 am), https://www.wsj.com/articles/huawei-founder-ren-zhengfei-takes-off-the-gloves-in-fight-against-u-s-11591416028.

42
COMPLAINT

proclamation, "it's hardly an encouraging tone, given the company's repeated criminal behavior."[42]

143.   In 2019, Mr. Ren was quoted as telling Huawei employees to work aggressively towards sales targets as the company goes into "battle mode" and "[t]he company is facing a live-or-die moment."[43] Mr. Ren declared Huawei's intent to "dominate the world": "In 3-5 years' time, Huawei will be flowing with new blood, Ren said.'After we survive the most critical moment in history, a new army would be born. To do what? Dominate the world.'" On information and belief, Huawei's efforts to dominate the world are connected to and supported by the Chinese government's continued efforts to gain technological supremacy at any cost.

144.   The New York Times reported in 2019 that Huawei "demand[ed] that the American wireless giant [Verizon] pay licensing fees on hundreds of patents" and "[a]dded up, Huawei's claims would exceed $1 billion in fees."[44] As The New York Times reported, "Huawei has been shut out of the American smartphone market for years, and the patent claim is a way for the Chinese tech giant to try to extract some revenue from American companies." According to The New York Times, Huawei "warned executives at American tech giants such as Microsoft and Dell that they faced retribution if they cooperated" with the American government's ban on sales of American technology to Chinese companies.

145.   In 2020, Mr. Ren was quoted as telling Huawei employees that Huawei

---

[42] Christopher Wray, Dir., Fed. Bureau of Investigation, The Threat Posed by the Chinese Government and the Chinese Communist Party to the Economic and National Security of the United States (July 7, 2020), https://www.fbi.gov/news/speeches/the-threat-posed-by-the-chinese-government-and-the-chinese-communist-party-to-the-economic-and-national-security-of-the-united-states.

[43] Sijia Jiang, *Huawei founder details 'battle mode' reform plan to beat U.S. crisis*, Reuters (Aug. 20, 2019 6:43 AM), https://www.reuters.com/article/idUSKCN1VA0Z0/.

[44] Paul Mozar, & Edmund Lee, *Huawei Is Said to Demand Patent Fees From Verizon*, New York Times (June 12, 2019), https://www.nytimes.com/2019/06/12/technology/huawei-verizon-patent-license-fees.html.

had "entered a state of war" after Huawei found itself at the center of a technology battle between China and the United States.[45]

146.    CNBC reported in 2023 that "Huawei is turning to patents for a lifeline."[46] As Huawei's revenue dropped for the first time on record in 2021, "licensing its patents to other companies has the potential to claw back a bit of that revenue." A source indicated that "Huawei is aggressively pushing for the monetization of its patents" and "[i]t is one of the most important [key performance indicators] of their IP department, if not yet the single most important." Another source indicated that Huawei has "been floundering around since the demise of their handset business" and that Huawei did not have "a choice in terms of sort of boosting their licensing revenue."

147.    Huawei, its parents, global affiliates and subsidiaries, including Futurewei, Huawei Device USA, Huawei USA, and others, constitute an "enterprise," as defined in Title 18, United States Code, Section 1961(4) (the "Huawei Enterprise"). The Huawei Enterprise is and was engaged in, and its activities affected, interstate and foreign commerce as described below and has and had the common purpose of illegitimately dominating global markets. Each of Huawei, Huawei USA, Huawei Device USA, and Futurewei were and are willfully involved in the unlawful activities of the Huawei Enterprise. The affairs of the Huawei Enterprise were managed and directed by Huawei. As further detailed below, on information and belief, the Huawei Enterprise operated in several districts of the United States, including the Central District of California, the Northern District of California, the Eastern District of New

---

[45] Jemma Carr, *Huawei founder declares war on the West as he urges workers to 'surge forward, killing as you go, to blaze us a trail of blood' in battle for supremacy*, Daily Mail (June 7, 2020 6:24 AM), https://www.dailymail.co.uk/news/article-8396191/Huawei-urges-workers-surge-forward-killing-blaze-trail-blood.html.

[46] Evelyn Cheng, *Huawei turns to patents for a lifeline — including those in the U.S.*, CNBC (Feb. 5, 2023 10:06 PM), https://www.cnbc.com/2023/02/06/huawei-turns-to-patents-for-a-lifeline-including-those-in-the-us.html#:~:text=The%20U.S.%20government%20put%20Huawei,on%20high%2Dend%20semiconductor%20tech.

York, the Northern District of Texas, and the Eastern District of Texas.

148.   The Huawei Enterprise engages in, and its activities affect interstate commerce in connection with the Huawei Enterprise's business of misappropriating trade secrets and intellectual property rights, knowingly making false commitments to SSOs to induce reliance and incorporation of Huawei technology in standards and products worldwide, using its improperly gained "hold-up" power to issue coercive threats to United States companies concerning its patents, and coercing United States companies to participate in licensing programs at rates and under conditions that the Huawei Enterprise is legally prohibited from seeking under its RAND obligations, all for the illegitimate purpose of injuring victim companies, bolstering the anti-competitive effects of its licensing scheme, and dominating global markets.

149.   As described above and in the Superseding Indictment (discussed below), Huawei and its affiliates have acted with the purpose to grow the global "Huawei" brand into one of the most powerful telecommunications equipment and consumer electronics companies in the world by entering, developing and dominating the markets for telecommunications and consumer electronics technology and services in the United States and worldwide. By misappropriating intellectual property rights, including by fraudulent means of enjoining or excluding others from practicing the Wi-Fi or other standards or demanding exorbitant and unreasonable licensing terms to drive up costs for competitors, Huawei can extort money and value from competitors and control and dominate the market for Wi-Fi and other technology worldwide.

**1.      The Scheme to Defraud Victim United States Companies in Violation of U.S. Code**

150.   Huawei has engaged in a pattern and scheme to improperly threaten, defraud, and extort money and value Huawei is not entitled from businesses, like NETGEAR in the United States, that use standardized technology, including Wi-Fi (IEEE 802.11) technology. On information and belief, Huawei's objective during an SSO's consideration of proposed standards was first to cause those technologies to be

45
COMPLAINT

standardized with Huawei's alleged essential technology through the advocacy of Huawei's representatives for the adoption of the relevant technologies. Huawei then, on information and belief, made false promises to SSOs to license any SEPs on RAND terms and conditions. Following the adoption of this technology and incorporation in the standards, instead of abiding by its RAND promises and obligations, Huawei, together with Huawei USA and Futurewei, sought to improperly use its gained "hold-up" power as an SEP holder to dominate the global markets through either exorbitant licensing terms or improper injunctions and exclusions of competition.

151. Huawei's failure to uphold its RAND commitment and negotiate in good faith with NETGEAR for RAND terms and conditions and to instead seek an exorbitant RAND rate and injunctions, and to extort money, value and property from NETGEAR is just one of the many efforts by Huawei and its affiliates and subsidiaries to manipulate global markets and target victim United States companies. Huawei has a long history of failing to abide by the rules and laws concerning intellectual property rights in the United States and throughout the world, in particular, by scheming to defraud SSOs and victim United States companies by knowingly misrepresenting its RAND commitments and failing to comply with its RAND obligations, as described below.

152. This is Huawei's *modus operandi* and illegal pattern of fraud in the United States and globally. Huawei knowingly provides fraudulent commitments to SSOs that are relied upon by the SSOs and the industry, and commences licensing negotiations with United States companies, and includes Futurewei and, on information and belief, Huawei USA in the negotiations, under the pretense of RAND, but repeatedly fails to provide the critical information to determine whether any rate that Huawei seeks is in fact RAND. This includes not providing: 1) identification of the relevant SEPs as opposed to non-essential patents/claims (and instead of insisting on a portfolio-wide license); 2) an offer with specific RAND terms, including the

royalty base; and 3) any comparable license agreements with comparable companies, and/or identification of other companies that are paying the rate that Huawei seeks.

153.   Huawei seeks grossly excessive or supracompetitive licensing rates on a "take it or leave it" and "all or nothing" approach and, on information and belief, under the coercive threat of litigation and injunctions. On information and belief, Huawei and the Huawei Enterprise used mail and/or wire in interstate and foreign commerce to further its scheme to defraud victim United States companies and in violation of United States laws, including Title 18, United States Code, Sections 1341 and 1343.

154.   Instead of engaging in good-faith negotiations and offering a license on RAND terms for its SEPs, Huawei files actions for patent infringement in the United States and abroad, seeking injunctive relief and damages in excess of RAND terms in violation of its licensing declarations and RAND obligations. Companies are required to engage in costly litigation and face exclusion from the market or pay Huawei's exorbitant demands, ultimately diminishing their place in the market due to these licensing costs.

155.   Market participants like NETGEAR have made very substantial investments to develop and market products globally designed to be compatible with standards, like the Wi-Fi standards, in reliance upon Huawei's explicit and implicit commitments to license its purportedly essential IPR on RAND terms and conditions. Huawei made these commitments knowing that it would not uphold them and would seek to exploit that reliance and its "hold up" power to obtain exorbitant licensing rates or injunctions to control and dominate the market and injure NETGEAR and other United States companies.

156.   The purpose of Huawei's pattern and scheme of illegal conduct is not legitimate enforcement of its alleged patent rights, but rather its worldwide scheme and pattern to dominate global markets by unlawfully taxing successful standards, like IEEE 802.11 Wi-Fi standards, and implementers, by attempting to license at rates that

have no reasonable relation to the value of the patents being asserted, in contravention of RAND commitments, and improperly seeking injunctive relief, to block competition in the markets rather than abide by its obligations to negotiate and license at RAND terms. Huawei improperly seeks injunctive relief that is inconsistent with its RAND commitments and seeks to obtain royalties based on "hold-up" power rather than the incremental value of alleged SEPs. Huawei's actions demonstrate that Huawei never intended to comply with its RAND obligations but fraudulently planned to improperly gain and use "hold up" power to exclude competition and drive up costs for competitors to dominate the markets worldwide.

157. Huawei knew and intended its fraudulent commitments would injure the victim United States companies through demands of exorbitant licensing rates, non-RAND terms and conditions, and coercive threats and/or initiation of litigation.

158. As the spokesperson for Verizon, one of the several United States victims of Huawei's schemes to defraud and misappropriate intellectual property, told The New York Times, "these issues are larger than just Verizon" and "[g]iven the broader geopolitical context, any issue involving Huawei has implications for our entire industry and also raise national and international concerns."

### i. NETGEAR

159. Huawei claims its patents are essential, and to the extent Huawei's patents are essential to the IEEE 802.11 standard, Huawei is obligated to provide NETGEAR with a license under RAND terms and conditions as required by IEEE. Huawei has failed and refused to do so.

160. Huawei's irrevocable promises to IEEE, on information and belief, were not made in good faith but were made with deceptive intent, constitute misrepresentations to the IEEE and the world, constitute a scheme to defraud for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, and constitute mail and wire fraud under the laws of the United States.

COMPLAINT

161.   Huawei knew that at the time it made the promises to license any Wi-Fi essential patents under RAND terms and conditions, it did not intend to abide by those promises. On information and belief, Huawei sent its fraudulent commitments via mail and/or wire to the IEEE in the United States with deceptive intent and knowing that it would use additional mail and/or wire communications to NETGEAR and other companies located in the United States to further its fraudulent scheme and demand and threaten non-RAND terms and conditions to extort non-RAND license fees.

162.   Although Huawei committed to IEEE to license any SEPs on RAND terms and conditions, Huawei violated its commitments by seeking to enjoin or exclude NETGEAR, a willing licensee, from practicing the Wi-Fi standard and by failing to offer and grant RAND terms and conditions for licensing of any Huawei Wi-Fi essential patents.

163.   As described above, before filing litigation seeking an injunction, Huawei never identified the specific Wi-Fi SEPs it claims to own or what Wi-Fi standard they apply to, and Huawei did not express a willingness or offer of RAND terms and conditions. Huawei provided only general references to its "Wi-Fi patent portfolio" with a list of 1800 patents. No reference was made to the negotiation and offer of a RAND license or Huawei's IEEE commitments. Huawei never provided comparable license agreements for NETGEAR to determine whether any offer was, in fact, non-discriminatory. Huawei further failed to provide the Qualcomm License.

164.   Huawei first indicated its desire to negotiate a license to its Wi-Fi 6 patent portfolio in an April 4, 2022, email to NETGEAR's United States counsel, amongst others. By this date, however, Huawei had already filed an action on March 2, 2022, in Germany seeking an injunction. It was not until three months after Huawei filed the Germany action that it provided any ███████████████████. On June 16, 2022, Huawei provided ██████████████████████████ ████████ standards via email to NETGEAR's counsel in the United States and Germany. NETGEAR asked for Huawei's assistance in the evaluation of the portfolio

49

COMPLAINT

███████████████████████████████████████████████████

███████████████████████████████ Huawei never complied with this request.

165. Huawei did not provide an offer of alleged RAND terms until June 25, 2022, three months after the filing of litigation in Germany. This offer only contained rudimentary information ███████████████████████████████ ████████████ NETGEAR requested Huawei provide all third-party licenses, which include a license under Huawei's Wi-Fi 6 and/or Wi-Fi 5 SEPs, but Huawei has refused to provide this information. As described above, Huawei has instead engaged in a "take or leave it" and "all-or-nothing" approach during its negotiations with NETGEAR, never moving from its initial offer nor identifying specific SEPs, and has thus not complied with its RAND obligations.

166. Huawei's non-RAND demands have continued during the litigation via email, video conference, and in-person meetings involving Huawei's employees, German counsel, and NETGEAR's United States-based counsel. Huawei's United States Chief Intellectual Property Counsel, on information and belief, located in Texas, has been involved in these demands via email, using a futurewei.com email address and has attended meetings virtually. Futurewei's Corporate IP Counsel, on information and belief, located in California, has been involved in these demands via email, using a futurewei.com email address and has attended meetings virtually. Counsel from Futurewei, located in the United States, virtually attended meetings on at least July 25, 2022, and May 4, 2023. On information and belief, counsel attended from the United States including California and Texas.

167. Huawei and the Huawei Enterprise participated in a scheme to defraud by participating in the IEEE standards process and intentionally misrepresenting its RAND commitment to the IEEE and the world, including third-party beneficiaries like NETGEAR. The IEEE, NETGEAR and others relied on Huawei's commitments in incorporating the technology into the Wi-Fi standards and selling Wi-Fi standard

technology in products in the United States and throughout the world.

168.  Huawei's actions of failing to provide RAND terms and proceeding with litigation in clear violation of its RAND obligations demonstrate that Huawei never intended to comply with its RAND obligations but fraudulently planned to improperly gain and use "hold up" power to exclude competition and drive up costs for competitors to dominate the markets worldwide. NETGEAR, at all times, has remained a willing licensee for Huawei's SEPs and continues to negotiate in good faith. Despite NETGEAR's willingness to license on RAND terms, Huawei continues to pursue litigation in Germany, the UPC, and China, seeking injunctive relief.

169.  Huawei and the Huawei Enterprise used mail and/or wire in interstate and foreign commerce to commence the fraudulent scheme by sending the LOAs to IEEE in the United States and to further the scheme to defraud IEEE, NETGEAR and others in violation of United States laws, including Title 18, United States Code, Sections 1341 and 1343. Huawei and the Huawei Enterprise further used mail and/or wires to further the scheme to defraud and seek exorbitant licensing rates from NETGEAR under the coercive threat of litigation.

170.  As a result of Huawei and the Huawei Enterprise's mail and/or wire fraud schemes and its pattern of racketeering activity as described below, NETGEAR has been injured in its business or property and is threatened by imminent loss of profits, forfeiture of property, loss of investment and value in the technology and its products, loss of customers and/or potential customers, and/or loss of goodwill and product image, including fees and costs associated with investigating Huawei's scheme to defraud and litigation in Germany, UPC, China, and the United States.

### ii.   ADVA

171.  On May 8, 2023, ADVA Optical Networking North America, Inc. ("ADVA NA") and ADVA Optical Networking SE ("ADVA SE") filed a complaint against Huawei Technologies Co. Ltd. in the United States District Court for the Eastern District of Texas alleging claims of fraud, unfair competition and breach of

contract, amongst others.[47]

172.   On information and belief, ADVA NA is a Delaware corporation with its principal place of business at 5755 Peachtree Industrial Boulevard, Norcross, Georgia 30092-3502, and has offices at 2301 Greenville Avenue, Richardson, Texas 75082.

173.   On information and belief, ADVA SE is a Societas Europaea organized under the laws of the European Union, with a principal place of business located at Fraunhoferstraße 9a, 82152 Martinsried/Munich, Germany, and ADVA NA is a subsidiary of ADVA SE. On information and belief, ADVA SE is majority owned and controlled by Adtran Holdings, Inc., a Delaware corporation with its principal place of business at 901 Explorer Boulevard, Huntsville, Alabama 35806-2807.

174.   On information and belief, ADVA is "a leading provider of network equipment for data, storage, voice and video services" and brought the lawsuit "in part, based on Huawei's failure to offer a license to its alleged standard essential patents ('SEPs') on fair, reasonable, and non-discriminatory ('FRAND') terms and conditions in breach of contractual obligations Huawei made through participation in the Telecommunication Standardization Sector of the International Telecommunication Union ('ITU-T')."

175.   Specifically, ADVA alleged that "Huawei's General Patent Statement provides, 'The Patent Holder is prepared to grant—on the basis of reciprocity for the relevant ITU-T Recommendation(s)—a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to make, use and sell implementations of the relevant ITU-T Recommendation(s).' *See* September 8, 2006 letter from Yan Xin, IP Manager at Huawei Technologies Co., Ltd., to Director of ITU-T."

176.   Further, ADVA alleged that "Huawei and/or its predecessor made similar representations in specific Patent Statement and Licensing Declarations filed under

---

[47] *ADVA Optical Networking NA, Inc. v. Huawei Techs. Co., Ltd.*, No. 2:23-cv-00201, Dkt. 1 (E.D. Tex. May 8, 2023).

OTN standards, including G.709/Y.1331 (December 10, 2008; December 23, 2011; April 23, 2012; March 13, 2018), G.709.1 (October 18, 2016), G.7042 (February 15, 2006), G.7044 (August 23, 2011), G.873.2 (September 17, 2014), G.Sup 56 (March 13, 2018), and G.Sup 70 (February 8, 2022)" and "Huawei and/or its predecessor made similar representations in specific Patent Statement Licensing Declarations filed under DC standards, including G.8032 (July 12, 2011), G.8264 (April 13, 2018), G.8275.1 (April 12, 2019 and February 8, 2022), and G.Sup 68 (March 12, 2020)."

177.   ADVA alleged it "necessarily relied on Huawei and other patent holders' participation in the development of the OTN and DC standards that licenses would be available to any essential patents held by patent holders and their assignees on FRAND terms." ADVA further alleged that "Huawei purports to own patents that have been declared essential to the ITU-T standards that are implemented by the products ADVA designs, manufactures and sells in the United States, Texas and/or the Eastern District of Texas." ADVA's complaint identified its United States operations:

- "ADVA invests significant resources in research and product development in the United States and abroad as well as acquires and integrates complementary technologies."

- "ADVA NA leads global research and development for certain ADVA products at issue from its Norcross, Georgia facility. ADVA's OTN and Ethernet-based networking research and product development occurs in the United States, with OTN research and development occurring, among other places, in its Norcross, Georgia facility. Research and development for ADVA's Ethernet-based networking products, which Huawei's DC SEPs implicate, occurs, among other places, in its Richardson, Texas facility."

- "ADVA NA's Richardson, Texas facility employs over 100 personnel, including over 50 personnel in research and development, engaged in developing, producing, selling and distributing Optical and Ethernet-based

53
COMPLAINT

networking solutions to telecommunications carriers and enterprises to deliver data, storage, voice and video services. Personnel from this Richardson, Texas office are directly involved in, among other things, the research, development and sale of ADVA products implicated by this Complaint and Huawei's breach of its FRAND commitments and anticompetitive and fraudulent behavior relating to ADVA's products."

178.   ADVA alleged that "Huawei's royalty demands for a patent license violate its FRAND commitments, including, but not limited to, by:

- Attempting to seek grossly excessive or supracompetitive from ADVA for a license to its alleged OTN and DC SEPs; and
- Demanding ADVA pay royalties for patents that are, in fact, not essential to the ITU-T standards; and
- Bundling essential and non-essential patents, and demanding ADVA pay royalties for patents for which ADVA does not require a license."

179.   ADVA further alleged that it "ha[d] no choice but to bring this lawsuit to address the above breach of contract and other violations of law, and to obtain a license on behalf of itself and all of its worldwide affiliates who require such a license to the OTN and DC SEPs owned or controlled by Huawei on FRAND terms and conditions."

180.   ADVA further alleged that "Huawei knowingly, or recklessly and without regard to its truth, made a false promise to the ITU-T that it would license its technology on FRAND terms and conditions so as to induce those SSOs to adopt its technology. Huawei affirmatively misrepresented its intent to license its technologies on FRAND terms and conditions to the ITU-T. Huawei, as part of its efforts to have its patents declared essential, falsely committed to offer licenses on FRAND terms and conditions to the essential patents."

181.   ADVA alleged that "ADVA SE, on behalf of ADVA NA which is located in Texas, has been involved in attempting to obtain FRAND royalties for a

54
COMPLAINT

license to Huawei's alleged SEPs. Thus, this lawsuit arises out of Huawei's contacts with Texas with respect to its FRAND commitments, its failure to offer FRAND royalties to ADVA SE and ADVA NA, its hold-up negotiation tactics, unfair acts and fraud related thereto."

182.   Regarding its negotiations with Huawei, ADVA alleged that "[s]ince the commencement of licensing negotiations between Huawei and ADVA, ADVA has repeatedly asked Huawei to provide basic information necessary for ADVA to determine whether any rate that Huawei quotes is in fact, fair, reasonable, and non-discriminatory, including (a) the royalty base to which Huawei contends the FRAND royalty rates would apply, (b) any evidence that other companies are also paying comparable royalty rates to those Huawei demands from ADVA, and (c) copies or summaries of license agreements with comparable companies."

183.   ADVA's complaint details the history of Huawei's negotiation tactics starting in 2022, which demonstrates Huawei's pattern and scheme to defraud ADVA and others by intentionally making false commitments to an SSO and subsequently attempting to extract supracompetitive rates and non-RAND terms:

- Huawei provided "a lengthy laundry list of Huawei patents and did not identify the relevance of those patents to any ADVA product or standard."
- "Huawei demanded royalty rates for its OTN and DC SEPs relating to certain ITU-T standards that were separately and collectively exorbitant."
- Huawei "purported to identify comparable rates from unidentified licensors" but failed to "provide any information regarding who the Licensors are, how this technology is comparable, what specific products were covered by the licenses, or how the FRAND rate proposed based on these alleged comparable rates is fair and reasonable for ADVA and the OTN and DC technology."
- Huawei delayed in negotiating an NDA, instead "'[h]iding behind a purported 'strict confidentiality regime' [that] casts significant doubt on

Huawei's statement and raises the specter of a large SEP patent holder seeking supracompetitive rates while refusing to provide the very documents that it alleges support such rates.'"

- Huawei refused "to provide any comparable licenses or information from such licenses (even public information) to support its proposed royalty rates" and instead confirmed "'Huawei is the licensee for the comparable license [from the August 2, 2022 presentation] signed before,' not the licensor."

- "Huawei continued to advance its 'take it or leave it' approach and refused to consider ADVA's counteroffer or provide its own counteroffer."

184.   ADVA alleged that throughout the negotiations, "ADVA continued to express a willingness to obtain a FRAND license and Huawei continued its failure [to] comply with its FRAND obligations."

185.   According to ADVA's complaint, the patents identified by Huawei during negotiations included United States Patents. For example, in its Count for "Declaratory Judge of Non-Infringement for U.S. Patent No. 9,225,462" ("the '462 patent"), ADVA alleged that "Huawei declared the '462 patent essential to the ITU-T standards, including at least ITU-T Recommendation G.709/Y.1331 (02/2022)" and "Huawei, during negotiations, alleged that ADVA infringed and required a license to the '462 patent. Huawei identified this patent and its patent family as representative of ADVA's alleged infringement by virtue of practicing the ITU-T standards. Huawei provided a claim chart in support of its allegations mapping at least one claim of the '462 patent to the ITU-T standard (G.709/Y.1331 (02/2022))."

186.   On information and belief, Huawei and the Huawei Enterprise used mail and/or wire in interstate and foreign commerce to further the scheme to defraud ADVA and to extract non-RAND rates with the purpose of injuring ADVA in violation of United States laws, including 18 U.S.C. §§ 1341 and 1343. On information and belief, Huawei and the Huawei Enterprise acted knowingly that the use of mail and/or wire in interstate and foreign commerce in furtherance of the

56

COMPLAINT

scheme to defraud would follow in the ordinary course of business and could be reasonably foreseen.

### iii.   Verizon

187.   On February 5, 2020, Huawei Technologies Co., Ltd. filed litigation in the United States District Court for the Eastern District of Texas against Verizon Communications, Inc., Verizon Business Network Services, Inc., Verizon Enterprise Solutions LLC, Cellco Partnership d/b/a Verizon Wireless, Inc., Verizon Data Services LLC, Verizon Business Global, LLC, Verizon Services Corp, and Verizon Patent and Licensing Inc. alleging infringement of patents that Huawei contended are essential to ITU-T standards and had agreed to license on FRAND terms. [48]

188.   On information and belief, Verizon Communications, Inc. is a Delaware corporation with its principal place of business at 1095 Avenue of the Americas, New York, NY 10036.

189.   On information and belief, Verizon Business Network Services, Inc. is a Delaware corporation with its principal place of business at 22001 Loudoun County Parkway, Ashburn, Virginia 20147.

190.   On information and belief, Verizon Enterprise Solutions LLC was a Delaware limited liability company with its principal place of business at One Verizon Way, Basking Ridge, New Jersey 07920.

191.   On information and belief, Cellco Partnership d/b/a Verizon Wireless, Inc. is a General Partnership with its principal place of business at One Verizon Way, Basking Ridge, New Jersey 07920.

192.   On information and belief, Verizon Data Services LLC is a Delaware limited liability company with its principal place of business at One East Telecom Parkway, B3E, Temple Terrace, Florida 33637.

193.   On information and belief, Verizon Business Global, LLC is a Delaware

---

[48] *Huawei Techs. Co., Ltd. v. Verizon Commc'n, Inc.*, No. 2:20-cv-00030-JRG, Dkt. 1 (E.D. Tex., Feb. 5, 2020). Huawei filed a first amended complaint on April 21, 2020. No. 2:20-cv-00030-JRG, Dkt. 27 (E.D. Tex. Apr. 21, 2020).

corporation with its principal place of business at One Verizon Way, Basking Ridge, New Jersey.

194.    On information and belief, Verizon Services Corp. is a Delaware corporation with its principal place of business at 1717 Arch Street, 21st Floor, Philadelphia, PA 19103.

195.    On information and belief, Verizon Patent and Licensing Inc. is a Delaware corporation with its principal place of business at One Verizon Way, Basking Ridge, New Jersey 07920

196.    Huawei's first amended complaint states that it "actively contributes to network-related standards through its participation in worldwide Standard Setting Organizations ('SSOs'), such as ETSI/3GPP, IETF, ITU-T, OIF, IEEE, GSMA, CCSA, IMTC, SIP Forum, MSF, NGMN, OMA, 3GPP2, and oneM2M" and "[b]y the end of 2018, Huawei was engaged in over 400 SSOs, industry alliances, and open source communities. In 2018 alone, Huawei submitted more than 5,000 proposals, bringing its total number of submissions to nearly 60,000. *See* (Huawei's 2018 Annual Report at 59). In addition, Huawei has obtained more than 400 key positions, such as chairs, rapporteurs, and editors, in these network technology related SSOs."

197.    Huawei's first amended complaint claims an alleged "RAND Commitment" to the ITU-T (*see* paragraphs 40-46) that, on information and belief, was falsely made, and several subsequent communications that, on information and belief, occurred via wire and/or mail with Verizon in the United States in furtherance of its scheme to defraud and extract supracompetitive rates and non-RAND terms, as described further herein:

- "[O]n February 7, 2019, Huawei contacted Verizon to discuss Verizon's need for a license to Huawei's patents. Huawei specifically identified patents from its portfolio and specific services offered by Verizon that infringed Huawei's patents, including those at issue in this case."

- "On March 29, 2019, Huawei provided a number of claim charts to Verizon

58
COMPLAINT

with even more detailed information regarding Verizon's infringement."

- "On June 18, 2019, Huawei representatives spoke with Verizon representatives via telephone."

- "On December 19, 2019, Huawei again provided its offer for a license to its portfolio of optical transport patents to Verizon via email."

198.  According to The New York Times, "[i]n the letter, dated March 29, Huawei wrote to Verizon that 'we trust you will see the benefits of taking a license to our patent portfolio.'" The New York Times further reported that the "two companies have exchanged several emails and phone calls since." On information and belief, these communications occurred via wire and/or mail with Verizon in the United States and included representatives from Futurewei and/or Huawei USA.

199.  Huawei's first amended complaint also provides details of in-person meetings in 2019 and 2020, confirming several meetings took place between Verizon and Huawei representatives from China in New York, which, on information and belief, included representatives from Futurewei and/or Huawei USA.

200.  Verizon filed an answer and counterclaims against Huawei, Futurewei, and Huawei USA for patent infringement, declaratory judgment of obligations to license under FRAND/RAND terms, breach of contract, unfair competition, and fraud.[49]

201.  Verizon alleged that it is "one of America's most innovative companies and a key portion of America's telecommunications infrastructure. Verizon offers industry-leading connectivity to its customers, connecting millions of people, companies and communities through its award-winning networks" and "[m]uch as it has led the way in 4G LTE network reliability and speeds, Verizon is innovating in 5G network technology."

202.  Verizon admitted, "that Huawei filed suit against Verizon before the

---

[49] *See* Second Amended Answer and Counterclaims, No. 2:20-cv-00030-JRG, Dkt. 155 (redacted) (E.D. Tex. Jan. 11, 2021).

parties concluded their licensing negotiations."

203.   Verizon identified Huawei's alleged "irrevocable guarantees to the ITU-T":

- "[O]n September 8, 2006: 'The Patent Holder is prepared to grant—on the basis of reciprocity for the relevant ITU-T Recommendation(s)—a license to an unrestricted number of applicants on a worldwide, nondiscriminatory basis and on reasonable terms and conditions to make, use and sell implementations of the relevant ITU-T Recommendation(s).' (*See* September 8, 2006 letter from Yan Xin, IP Manager at Huawei Technologies Co., Ltd., to Director of ITU-T.)."

- "Huawei and/or its predecessors also made a similar irrevocable guarantee to the G.709 on December 10, 2008; December 23, 2011; April 23, 2012; and October 17, 2016: 'The Patent Holder is prepared to grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to make, use and sell implementations of the above document.' (December 23, 2011 letter from Wei Kang, IP Manager at Huawei Technologies Co., Ltd.; *see* December 10, 2008 Letter from Huawei Technologies Co., Ltd, Director of Licensing, Intellectual Property Department; April 23, 2012 letter from Wei Kang, IP Manager at Huawei Technologies Co., Ltd.; October 17, 2016 letter from Wei Kang, IP Manager at Huawei Technologies Co., Ltd.)."

204.   Verizon further alleged that Huawei "never disclosed to the ITU-T any specific patents or applications that they believed related to the ITU-T G.709 Recommendation and ITU-T G.8032 Recommendations" and this "failure to disclose the asserted patents to the ITU-T violated the ITU-T Patent Policy and the Common Patent Policy for ITU-T/ITU-R/ISO/IEC."

205.   Verizon alleged that "Huawei's and its representatives to the ITU-T's non-disclosure and false FRAND commitments proximately resulted in incorporation

60
COMPLAINT

into the standard of technology over which Huawei now claims patent rights. Huawei's non-disclosure and false FRAND commitments also induced implementers and users of the standard, such as Verizon, to incorporate certain functionality into their products that Huawei alleges infringes its IPR" and "Huawei, as part of its efforts to have its patents declared essential, falsely committed to offer licenses on FRAND terms to the essential patents."

206. Verizon's counterclaims provide further details regarding the communications between the parties. Verizon alleged that "[t]o date, Huawei has failed to offer Verizon a single license on FRAND terms for any of the asserted patents in the Complaint. Instead, Huawei filed this action for patent infringement against Verizon seeking damages in excess of FRAND terms in violation of its licensing declarations and FRAND obligations."

207. Verizon further alleged that Huawei failed to provide "basic information necessary for Verizon to determine whether any rate that Huawei quotes is in fact fair, reasonable, and non-discriminatory, including (a) the royalty basis to which Huawei contends the FRAND royalty rate would apply, (b) any indication that other companies are also paying any royalty rate that Huawei would seek from Verizon, and (c) copies or summaries of license agreements with comparable companies."

208. Verizon further alleged that "[t]he only offer that Huawei has made with respect to the asserted patents did not comply with its FRAND obligations."

209. Verizon further alleged that "[a]lthough Verizon believes that Huawei has entered into license agreements covering the asserted patents with other companies that implement the relevant standards, at the time of this filing, Huawei has refused to identify the terms and conditions of those licenses. Huawei has also repeatedly refused to provide copies, summaries, or any other information regarding license agreements between Huawei and other companies."

210. Verizon's counterclaims further demonstrate Huawei's pattern and scheme to defraud Verizon and others by intentionally making false commitments to

61
COMPLAINT

an SSO and subsequently attempting to extract supracompetitive rates and non-RAND terms. Verizon alleged Huawei's scheme to defraud the ITU-T and implementers, and the material misrepresentations that were relied upon by Verizon:

> Those commitments were misrepresentations that Huawei knew were false at the time they were made. And indeed, Huawei has subsequently refused to license its declared essential patents on FRAND terms, including by offering non-FRAND terms and by refusing to offer any terms whatsoever, and has otherwise attempted to use its declared essential patents as leverage in litigation. Each of the above commitments and misrepresentations by Huawei and its representatives to the ITU-T were material and false, Huawei knew these commitments and representations were material and false, the false commitments and representations were intended to induce implementers and users of the relevant standards, such as Verizon, to continue to implement and use the relevant standards, and Verizon actually and justifiably relied on these commitments and misrepresentations, which caused injury.

211.    Verizon further alleged Huawei's intention to gain and misuse "hold up" power to extract exorbitant royalties:

> Huawei and its representatives to the ITU-T failed to inform the ITU-T that Huawei would not meet its FRAND commitments and, on information and belief, such failure was intentional and made with deceptive intent in order to induce the ITU-T to include in the relevant standards technologies that Huawei claims are covered by Huawei's asserted patents. Huawei's objective during the ITU-T's consideration of the relevant technologies was first to cause those technologies to be standardized through the advocacy of Huawei's representatives to the ITU-T for the adoption of the relevant technologies and simultaneous deceit as described above, and then to take advantage of the lock-in effect by demanding exorbitant royalties or other license terms that were unfair, unreasonable, and/or discriminatory, which objective was flatly inconsistent with its prior explicit FRAND undertaking to the ITU-T.

212.    Verizon further alleged that it and "others have relied on Huawei's commitments that preclude Huawei from seeking to enjoin them from practicing the relevant standards (given that they are licensed as a resulting of Huawei's FRAND commitments), and that require Huawei to provide fair, reasonable, and non-discriminatory royalties and other license terms that would permit efficient competitors such as Verizon profitably to offer standards-compliant products in competition with Huawei and other owners of purportedly essential patents."

213.    On information and belief, Huawei and the Huawei Enterprise used mail and/or wire in interstate and foreign commerce to further the scheme to defraud

Verizon and to extract non-RAND rates with the purpose of injuring Verizon in violation of United States laws, including 18 U.S.C. §§ 1341 and 1343. On information and belief, Huawei and the Huawei Enterprise acted knowingly that the use of mail and/or wire in interstate and foreign commerce in furtherance of the scheme to defraud would follow in the ordinary course of business and could be reasonably foreseen.

### iv.    Harris Corporation/L3Harris Technologies

214.    On June 12, 2019, Huawei Device USA, Inc., Huawei Device Co., Ltd., Huawei Technologies USA, Inc., Huawei Technologies Co., Ltd and Huawei Device (Shenzhen) Co., Ltd. filed litigation in the United States District Court for the Eastern District of Texas against Harris Corporation (and later in the District of Delaware against L3Harris Technologies, Inc.) alleging infringement of patents that Huawei contended are essential to IEEE or European Telecommunications Standards Institute ("ETSI") standards and had agreed to license on RAND terms.[50]

215.    On information and belief, Harris Corporation was a Delaware corporation duly organized and existing under the laws of the state of Delaware, with its principal place of business at 1025 West NASA Boulevard, Melbourne, Florida. On information and belief, L3Harris Technologies, Inc. is a Delaware corporation duly organized and existing under the laws of the state of Delaware, with its principal place of business at 1025 West NASA Boulevard, Melbourne, Florida.

216.    On information and belief, Harris Corporation was an American technology company that produced wireless equipment for use in the government, defense, emergency service, and commercial sectors. On information and belief, in 2019, Harris merged with L3 Technologies to form L3Harris Technologies. On information and belief, L3Harris Technologies is the sixth largest defense contractor

---

[50] *Huawei Device USA Inc. v. Harris Corp.*, No. 2:19-cv-00222, Dkt. 4 (amended complaint) (E.D. Tex. June 21, 2019); *Huawei Techs. Co., Ltd. v. L3Harris Techs., Inc.*, No. 1:19-cv-01306, Dkt. 1 (D. Del. July 12, 2019).

in the world following the merger.[51]

217.   Huawei's amended complaint alleged that "Huawei actively participates and drives core telecommunications standards in leading technical organizations, such as 3GPP, IEEE, IETF, ITU-T, GSMA, ETSI, CCSA, IMTC, SIP Forum, MSF, NGMN, OMA, 3GPP2, etc. Huawei is a member of 400 Standard Setting Organizations ('SSOs'), industry alliances, and open source communities. Thousands of contributions submitted by Huawei were approved by these organizations. In addition, Huawei has obtained dozens of leadership positions in these core network technology related SSOs, such as chairs, rapporteurs, and editors." Huawei's amended complaint does not identify any RAND commitments or obligations.

218.   Huawei's amended complaint further alleged that "Harris knew of Huawei's patent portfolio before the filing of this action and was alerted by Huawei's December 5, 2018 email that Huawei's portfolio included a set of patents essential to the PoE standard" and "Harris knew of Huawei's patent portfolio before the filing of this action and was alerted by Huawei's December 5, 2018 email that Huawei's portfolio included a set of patents essential to the LTE standard." On information and belief, the December 5, 2018, email was sent by Huawei to Harris and/or L3Harris in the United States and included Futurewei, Huawei Device USA and/or Huawei USA.

219.   Harris filed an answer and counterclaims in the Texas action for breach of contract, declaratory judgment that Huawei has not made a FRAND offer, breach of good faith and fair dealing, promissory estoppel, waiver, and unfair competition, among other claims.[52]

220.   In its answer, Harris denied that "Huawei has offered a license to the Huawei Asserted Patents on fair, reasonable, and non-discriminatory terms."

---

[51] *See* Loren Thompson, *Defense Contractor L3 Technologies Surges As It Prepares To Enter Big Leagues*, Forbes (June 7, 2019 10:49 am), https://www.forbes.com/sites/lorenthompson/2019/06/07/defense-contractor-l3-technologies-surges-as-it-prepares-to-enter-big-leagues/?sh=5424678d3f5d.

[52] No. 2:19-cv-00222, Dkt. 5 (E.D. Tex. June 25, 2019); *see also* No. 1:19-cv-01306, Dkt. 8 (D. Del. Aug. 19, 2019).

221. In the counterclaims, Harris alleged that "[o]n May 19, 2008, Barbara Landmann, acting on behalf of the corporation known as Alcatel Lucent, submitted a Letter of Assurance ("LOA") to the IEEE-SA" and "[p]ursuant to the letter of assurance, Alcatel Lucent declared that it 'may own, control, or have the ability to license Patent Claims that might be or become Essential Patent Claims,' and whereby it agreed to 'grant a license under reasonable rates to an unrestricted number of applicants . . . with reasonable terms and conditions that are demonstrably free of unfair discrimination.'" Further, "[t]he Alcatel Lucent LOA is a 'Blanket Letter of Assurance. As such, all Essential Patent Claims that the Submitter may currently or in the future have the ability to license shall be available under the terms as indicated in part D.1' At the time Alcatel Lucent submitted this LOA, Alcatel-Lucent was the owner of U.S. Patent No. 6,715,087 which later reissued as the asserted '325 patent."

222. Harris's counterclaim further alleged that "[a]ccording to assignment records from the USPTO public database, Huawei acquired the rights to the '325 Patent on December 31, 2015. In this litigation, Huawei has taken the position that the '325 patent is essential to the IEEE 802.3at standard. In this litigation, Huawei has also admitted that it is obligated to license the Huawei Asserted Patents on FRAND terms. Case No. 2:18-cv-00439-JRG, Dkt. 68 at 1 (". . . Huawei readily acknowledges that its patents are subject to FRAND obligations . . ."). Accordingly, Huawei has a contractual obligation to license the '325 patent on FRAND terms in accordance with Alcatel-Lucent's LOA and the IEEE-SA policy."

223. Harris's counterclaim further alleged that "Huawei has submitted a general IPR licensing declaration whereby it has agreed to license any IPRs that it believes are essential to any ETSI Standards and Technical Specifications in accordance with Clause 6.1 of the ETSI IPR Policy."

224. Harris's counterclaim further alleged that "Huawei was bound by the ETSI IPR Policy during its participation at ETSI and also at the 3rd Generation Partnership Project (3GPP), of which ETSI is an organizational member. ETSI and its

65
COMPLAINT

members rely on the disclosure requirements to safeguard the standard-setting process and ensure that decisions regarding what technology to standardize are made with an understanding of the potential implications for those decisions on licensing patents that may be claimed essential to those technologies. Huawei failed to disclose the existence of its Huawei Asserted Patents or family members of its Huawei Asserted Patents during the standardization of cellular standards at ETSI and 3GPP, while participating in the development of technologies that it apparently believed were covered by patents now asserted against Harris."

225.   Harris's counterclaim further alleged that "[o]n information and belief, Huawei was aware of the impropriety of bringing an action for infringement after a party had expressed willingness to negotiate for a license on FRAND terms, but before offering such a license with specific terms including a royalty rate."

226.   Harris's counterclaim further alleged, "Harris was and remains a willing licensee of the Huawei Asserted Patents to the extent they are valid, enforceable, and infringed standard-essential patents."

227.   Harris's counterclaim alleged that Huawei sent mail and/or wire communications to Harris but did not provide any information about the offered license terms or identification of any alleged essential patents, demonstrating Huawei's pattern and scheme to defraud Harris and others by intentionally making false commitments to an SSO, and on information and belief, subsequently attempting to extract non-RAND terms under coercive threat of litigation:

- "On December 5, 2018 and December 21, 2018, Huawei sent Harris's licensing representative a presentation stating that Huawei had unidentified patents relating to LTE and Power over Ethernet and including no information about offered license terms."
- "On December 21, 2018, Huawei identified certain Huawei patents to Harris's licensing representative, including only one of the Huawei Asserted Patents."

66
COMPLAINT

- "On March 31, 2019, Huawei sent a letter to Harris stating that a worldwide FRAND license would be available but included no information about offered license terms and no further identification of patents (that would be asserted or otherwise)."

- "Harris responded to Huawei's March 31, 2019 letter on April 3, 2019 stating a willingness to include discussion of Huawei's Asserted Patents in ongoing discussions. Harris further arranged a phone call with Huawei representatives and further responded on April 12, 2019 that Harris would provide more details concerning Huawei's March 31, 2019 letter."

- "On April 22, 2019, Harris emailed Huawei to ask if they could set up a call that week."

228. Harris's counterclaims alleged that "[i]nstead, Huawei asserted its counterclaims for infringement on April 26, 2019 despite Harris's good faith responses and without having communicated specific offered license terms."

229. On information and belief, the communications alleged by Harris were received by Harris and/or L3Harris, from Huawei and included Huawei Device USA, Huawei USA and/or Futurewei via wire and/or mail in the United States.

230. Harris's counterclaim further alleged that Huawei filed litigation without offering FRAND license terms and did not provide proposed FRAND terms after filing the litigation in the United States:

> Contrary to the obligations expressed in its representations to Harris, Huawei did not make an offer to license Huawei's Asserted Patents on FRAND terms and conditions to Harris or otherwise negotiate a FRAND license in good faith before filing its counterclaims for patent infringement and to date it has not done so. Huawei did not communicate terms, including economic terms, to Harris. Huawei brought its counterclaims before even making any offer to Harris to license the Huawei Asserted Patents, and since initiating this suit Huawei has yet to provide FRAND terms to Harris for the Huawei Asserted Patents.

231. On information and belief, Huawei and the Huawei Enterprise used mail and/or wire in interstate and foreign commerce to further the scheme to defraud Harris/L3Harris and to extract non-RAND rates with the purpose of injuring

67
COMPLAINT

Harris/L3Harris in violation of United States laws, including 18 U.S.C. §§ 1341 and 1343. On information and belief, Huawei and the Huawei Enterprise acted knowingly that the use of mail and/or wire in interstate and foreign commerce in furtherance of the scheme to defraud would follow in the ordinary course of business and could be reasonably foreseen.

### v.    T-Mobile

232.    On January 15, 2016, Huawei Technologies Co. Ltd. filed four patent infringement actions against T-Mobile US, Inc. and T-Mobile USA, Inc. in the United States District Court for the Eastern District of Texas, asserting patents that Huawei contended are essential to cellular standards.[53] In each case, Huawei sought injunctive relief. Huawei further filed a declaratory judgment of compliance with SEP FRAND obligations against T-Mobile.[54]

233.    On information and belief, T-Mobile US, Inc. is a Delaware corporation with its principal place of business at 12920 SE 38th Street, Bellevue, Washington 98006. On information and belief, T-Mobile USA, Inc. is a Delaware corporation with its principal place of business at 12920 SE 38th Street, Bellevue, Washington 98006, and is a wholly-owned subsidiary of T-Mobile US, Inc.

234.    On information and belief, T-Mobile operates cellular wireless networks across the United States, and T-Mobile and/or its authorized retailers operate T-Mobile stores throughout the United States. On information and belief, T-Mobile's 4G wireless networks in the United States are used by customers to place and receive cellular phone calls, in addition to being used to send and receive data services, which are offered by or on behalf of T-Mobile.

235.    Huawei's complaints alleged that "Huawei actively participates and

---

[53] *See Huawei Techs. Co. Ltd. v, T-Mobile US Inc.,* No. 2:16-cv-00052, Dkt. 1; No. 2:16-cv-00055, Dkt. 1; No. 2:16-cv-00056, Dkt. 1; No. 2:16-cv-00057, Dkt. 1 (E.D. Tex. Jan. 15, 2016).

[54] *Huawei Techs. Co. Ltd. v. T-Mobile US Inc.*, No. 2:16-cv-00715, Dkt. 1 (E.D. Tex. July 5, 2016).

drives core network-related standards in eminent organizations, such as 3GPP, IETF, ITU-T, GSMA, ETSI, CCSA, IMTC, SIP Forum, MSF, NGMN, OMA, 3GPP2, etc." and "[b]y the end of 2014, Huawei was a member of approximately 170 Standard Setting Organizations ('SSOs'). More than 2,930 contributions submitted by Huawei were approved by these organizations. In addition, Huawei has obtained 76 leadership positions in these core network technology related SSOs, such as chairs, rapporteurs, and editors."

236.   Huawei's complaints did not identify any of its RAND commitments to these SSOs but alleged several communications with T-Mobile regarding patent licensing, which, on information and belief, were via mail and/or wire with T-Mobile in the United States and were bound by Huawei's RAND commitments and obligations as detailed further herein, including:

- "Huawei contacted T-Mobile on June 6, 2014, to discuss Huawei's Licensing Program. Huawei specifically identified patents from its portfolio and specific services offered by T-Mobile related to Huawei's patents, such as [4G] LTE and VoLTE."

- "On June 23, 2014, T-Mobile refused to sign the mutual non-disclosure agreement and rejected the idea of exchanging information under the mutual non-disclosure agreement."

- "On June 30, 2014, Huawei reiterated to T-Mobile Huawei's need for a mutual non-disclosure agreement to allow Huawei to provide T-Mobile non-public information such as an initial analysis regarding possible infringement of Huawei's patents."

- "On September 3, 2014, T-Mobile responded and continued to refuse to enter into any non-disclosure agreement."

237.   T-Mobile filed an answer and counterclaims in each case, alleging claims of breach of contract for FRAND and standards-related misconduct and unfair

competition, among others.[55]

238.   T-Mobile's answers admitted the existence of several communications with Huawei, including by email, which, on information and belief, were via wire and/or mail with T-Mobile in the United States, and included Futurewei, Huawei Device USA and/or Huawei USA:

- "T-Mobile admits that Huawei sent a letter to T-Mobile dated June 6, 2014; with respect to the contents of the letter, the document speaks for itself."
- "T-Mobile admits that it sent a letter to Huawei dated June 23, 2014; with respect to the contents of the letter, the document speaks for itself."
- "T-Mobile admits that Huawei sent an e-mail to T-Mobile that was received on June 29, 2014; with respect to the contents of the e-mail, the document speaks for itself."
- "T-Mobile admits that it sent a letter to Huawei dated September 3, 2014; with respect to the contents of the letter, the document speaks for itself."

239.   T-Mobile's counterclaims arose "from Huawei's baseless allegation of infringement of the Huawei Asserted Patents and its assertion of those patents—including by improperly seeking an injunction against T-Mobile—in violation of its binding contractual obligations to the European Telecommunications Standards Institute ('ETSI') to license them on fair, reasonable, and non-discriminatory ('FRAND') terms."

240.   T-Mobile's counterclaims alleged that "Huawei has made binding FRAND commitments to ETSI for each of the Huawei Asserted Patents." For example, "in a declaration dated March 14, 2011, Huawei disclosed to ETSI the Chinese priority application to U.S. Patent No. 8,069,365. The declaration indicates that '[i]n accordance with Clause 4.1 of the ETSI IPR Policy the Declarant and/or its

---

[55] *See Huawei Techs. Co. Ltd. v, T-Mobile US Inc.,* No. 2:16-cv-00052, Dkt. 106; No. 2:16-cv-00055, Dkt. 107; No. 2:16-cv-00056, Dkt. 108; No. 2:16-cv-00057, Dkt. 106 (E.D. Tex. Dec 6, 2016).

COMPLAINT

AFFILIATES hereby informs ETSI that it is the Declarant's and/or its AFFILIATES' present belief that the IPR(s) disclosed in the attached IPR Information Statement Annex may be or may become ESSENTIAL in relation to at least the ETSI Work Item(s), STANDARD(S) and/or TECHNICAL SPECIFICATION(S) identified in the attached IPR Statement Annex'" and the "'Declarant and/or its AFFILIATES are prepared to grant irrevocable licenses under this/these IPR(s) on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy.'"

241. T-Mobile's counterclaims confirmed that Huawei falsely made these RAND commitments and did not engage in negotiations consistent with RAND commitments. T-Mobile alleged that only following T-Mobile raising concerns of trade secret theft (as discussed further herein), Huawei sent a "June 6, 2014 letter in which Huawei raised for the first time with T-Mobile a licensing program relating to Huawei's claimed-essential cellular patents. In that letter, Huawei suggested that it would 'present our patents and additional information to you, upon the signature of a mutual non-disclosure agreement.'" In response, T-Mobile sent a letter on June 23, 2014 stating it was "'willing to evaluate and respond to the issues you have raised to the extent we are provide[d] with sufficient meaningful information to do so.' The letter further noted that Huawei had only identified patent numbers in its June 6 letter and that it 'provides little or no information regarding how Huawei's Licensing Program could be at all relevant to T-Mobile, what FRAND terms Huawei is proposing, or what precisely you would like T-Mobile to discuss or consider.'"

242. T-Mobile's counterclaims alleged that on June 29, 2014, Huawei responded in a letter "suggesting that it was 'willing to provide more information demonstrating the value of our patents once a NDA is entered.'"

243. On September 2, 2014, T-Mobile filed a complaint in the District Court for the Western District of Washington seeking to hold Huawei to account for its thefts of trade secrets and technology relating to Tappy, according to T-Mobile's counterclaims.

244.   T-Mobile's counterclaims alleged that on September 3, 2014, it "pointed out that it did not understand the need for an NDA in order for Huawei to provide its views to T-Mobile on its patents." T-Mobile further requested "Huawei provide specifics regarding its claim that T-Mobile requires a license from Huawei, including requesting that Huawei 'list each T-Mobile service that you believe needs a Huawei license, which of Huawei's 'exemplary' patents that Huawei believes are relevant to each service.'" T-Mobile further requested, "Huawei 'provide us with a list of those actual and potential licensees and identify the FRAND terms that Huawei offered to them.' T-Mobile further noted that Huawei's 'refusal to provide this basic information is preventing us from reaching any conclusions regarding what Huawei is proposing and why Huawei believes its patents are in any way relevant to T-Mobile.' T-Mobile closed its letter by stating its willingness to 'evaluate any FRAND licensing offer should Huawei ever make one, to the extent we are provided meaningful information to do so.'"

245.   T-Mobile's counterclaims further alleged that "[n]o FRAND offer from Huawei was forthcoming. Rather, Huawei's response came on January 16, 2016 when it sent a letter to T-Mobile in order to provide 'courtesy copies of four complaints for patent infringement' filed in this Court the day before."

246.   T-Mobile's counterclaims alleged that "Huawei's litigation and its request for injunctive relief breach Huawei's FRAND commitments. Huawei initiated litigation before making any licensing offer to T-Mobile." Further, T-Mobile confirmed that "Huawei has requested injunctive relief before any FRAND rate has been offered or established for the Asserted Patents."

247.   T-Mobile's counterclaims further alleged that "Huawei brought this action before even making any offer to T-Mobile to license the Asserted Patents, and since initiating this suit Huawei has refused to provide FRAND terms to T-Mobile for the Huawei Asserted Patents. Huawei has attempted to increase its leverage against T-Mobile by improperly seeking to enjoin T-Mobile, despite the fact that Huawei has

72
COMPLAINT

acknowledged that the FRAND commitment forecloses seeking such relief."

248. T-Mobile's counterclaims alleged it was subjected to Huawei's "serial litigation tactics" and taking the "all-or-nothing" approach, further demonstrating Huawei's pattern and scheme to defraud T-Mobile and others by intentionally making false commitments to an SSO and subsequently attempting to extract non-RAND terms under coercive threat of litigation:

> Huawei has claimed in negotiations with T-Mobile that it holds 'hundreds of standard essential patents and implementation patents in the United States and Europe.' In total, Huawei claims to own over 41,000 issued patents in jurisdictions around the world. Compl. ¶ 10. As described more fully below, Huawei has used the tactic of serial litigation—filing four separate infringement actions against T-Mobile asserting a total of fourteen patents and requesting injunctions—in an improper attempt to gain negotiating leverage over T-Mobile. In addition, as set forth more fully below, Huawei has refused to license individually its claimed-essential patents.

249. T-Mobile's counterclaims alleged that it "repeatedly requested that Huawei provide its FRAND rates for the asserted patents in this case as well as in each of the three other pending litigations. Huawei has refused repeated requests to provide FRAND rates specific to any of the patents that it has asserted against T-Mobile."

250. T-Mobile's counterclaims further alleged that "Huawei has refused repeated requests to provide FRAND rates specific to any of the patents that it has asserted against T-Mobile. Instead, on April 1, 2016, Huawei purported to offer a license to all Huawei U.S. patents for 4G. Huawei's demand also included payment by T-Mobile to Huawei of a 'Past Release Amount' for the period from January 1, 2013, to the effective date of January 1, 2016."

251. T-Mobile's counterclaims alleged that Huawei hid behind an NDA in refusing to provide a RAND offer before filing its lawsuits: "Notably, although Huawei had earlier suggested it could not make a licensing offer to T-Mobile without first entering a non-disclosure agreement, no such agreement was in place on April 1, 2016 when Huawei first made what Huawei purports to be an offer—months after it

had sued T-Mobile and accused T-Mobile of being an unwilling licensee."

252. T-Mobile was thus "faced with the prospect of acceding to Huawei's non-FRAND, portfolio-wide demands or risking serial litigation and the attendant risk of an improperly-sought injunction crippling its business."

253. On information and belief, Huawei and the Huawei Enterprise used mail and/or wire in interstate and foreign commerce to further the scheme to defraud T-Mobile and to extract non-RAND rates with the purpose of injuring T-Mobile in violation of United States laws, including 18 U.S.C. §§ 1341 and 1343. On information and belief, Huawei and the Huawei Enterprise acted knowingly that the use of mail and/or wire in interstate and foreign commerce in furtherance of the scheme to defraud would follow in the ordinary course of business and could be reasonably foreseen.

### vi. Additional United States Victim Companies

254. On information and belief, since at least 2006, Huawei and the Huawei Enterprise used mail and/or wire in interstate and foreign commerce to further the scheme to defraud additional United States victim companies by making false and material commitments to SSOs to license on RAND terms and conditions and to extract non-RAND rates with the purpose of injuring the companies in violation of United States laws, including 18 U.S.C. §§ 1341 and 1343. On information and belief, Huawei and the Huawei Enterprise acted knowingly that the use of mail and/or wire in interstate and foreign commerce in furtherance of the scheme to defraud would follow in the ordinary course of business and could be reasonably foreseen.

### 2. The Pattern of Racketeering Activity Involving Intellectual Property of United States Victim Companies

255. In February 2020, the United States government filed a Third Superseding Indictment in the United States District Court for the Eastern District of New York with several criminal charges against Huawei, Futurewei, Huawei Device USA, and others, charging Huawei and the Huawei Enterprise of decades-long efforts of devising schemes to operate and grow its business by misappropriating the

intellectual property of several United States companies, beginning in or about 2000 (the "Superseding Indictment").[56]

256. The Superseding Indictment describes a "Scheme to Misappropriate Intellectual Property" by Huawei, Futurewei, Huawei Device USA, and others, of six "Victim Companies" headquartered or with offices in the United States spanning from the early 2000s to 2018.

257. According to the Department of Justice news release, the "charges in this case relate to the alleged decades-long efforts by Huawei, and several of its subsidiaries, both in the U.S. and in the People's Republic of China, to misappropriate intellectual property, including from six U.S. technology companies, in an effort to grow and operate Huawei's business. The misappropriated intellectual property included trade secret information and copyrighted works, such as source code and user manuals for internet routers, antenna technology and robot testing technology. Huawei, Huawei [Device] USA and Futurewei agreed to reinvest the proceeds of this alleged racketeering activity in Huawei's worldwide business, including in the United States."[57]

258. On information and belief, the six United States victim companies of Huawei, Futurewei, Huawei USA, and Huawei Device USA's scheme to misappropriate intellectual property included:

- T-Mobile: Huawei was embroiled in civil and criminal actions related to Huawei's and Huawei Device USA's multi-year efforts to steal trade secrets of T-Mobile's "Tappy" robot and recreate Tappy because of the market advantage it was giving T-Mobile at the time. In 2017, a jury awarded T-Mobile $4.8 million in damages, and the parties ultimately

[56] *U.S. v. Huawei Techs. Co., Ltd.*, No. 1:18-cr-00457-AMD, Dkt. 126 (E.D.N.Y Feb. 13, 2020).

[57] *Chinese Telecommunications Conglomerate Huawei and Subsidiaries Charged in Racketeering Conspiracy and Conspiracy to Steal Trade Secrets*, U.S. Dep't of Just. (Feb. 13, 2020), https://www.justice.gov/opa/pr/chinese-telecommunications-conglomerate-huawei-and-subsidiaries-charged-racketeering.

settled T-Mobile's civil claims. In 2019, a grand jury in the Western District of Washington indicted Huawei for conspiring to steal T-Mobile's trade secrets based on the same operative facts that gave rise to the "Tappy" civil suit.[58] The Assistant United States Attorney stated that "[t]his indictment shines a bright light on Huawei's flagrant abuse of the law."[59]

- Cisco: On information and belief, Cisco Systems, Inc. is an American digital communications company headquartered in San Jose, California. In 2003, Cisco filed a lawsuit in the United States District Court for the Eastern District of Texas, alleging Huawei illegally copied its intellectual property.[60] Cisco alleged that "Huawei unlawfully copied and misappropriated Cisco's IOS software, including source code; copied Cisco documentation and other copyrighted materials; and infringed on numerous Cisco patents." At the time, "Huawei ha[d] emerged recently as a significant low-cost competitor to Cisco." In 2012, Cisco confirmed that a Neutral Expert "concluded that Huawei misappropriated [] code."[61] Cisco's CEO in 2012 further said that Huawei is a company that doesn't "always play by the rules" in an article that expressed "concerns that Huawei can't be trusted when it comes to respecting intellectual property

[58] Laurel Wamsley, *A Robot Named 'Tappy': Huawei Conspired To Steal T-Mobile's Trade Secrets, Says DOJ*, NPR (Jan. 29, 2019 4:37 PM), https://www.npr.org/2019/01/29/689663720/a-robot-named-tappy-huawei-conspired-to-steal-t-mobile-s-trade-secrets-says-doj#:~:text=Music%20Of%202023-,A%20Robot%20Named%20'Tappy'%3A%20Huawei%20Conspired%20To%20Steal%20T,T%2DMobile's%20brilliant%20testing%20robot.

[59] Tali Arbel, *Tappy the robot is behind part of charges against Huawei*, Associated Press (Jan. 29, 2019 2:47 PM), https://apnews.com/general-news-a1ae04e229bf47e7b36a696e8ea4ba57.

[60] Jim Duffy, *Cisco sues Huawei over intellectual property*, Computerworld (Jan. 23, 2003), https://www.computerworld.com/article/2578617/cisco-sues-huawei-over-intellectual-property.html.

[61] Mark Chandler, *Huawei and Cisco's Source Code: Correcting the Record*, Cisco Blogs (Oct. 11, 2012), https://blogs.cisco.com/news/huawei-and-ciscos-source-code-correcting-the-record.

76
COMPLAINT

rights."[62]

- Motorola Solutions: On information and belief, Motorola Solutions is an American telecommunications company headquartered in Chicago, Illinois. According to its CEO, "in 2007, a Motorola engineer was arrested at O'Hare Airport [in Chicago] with a one-way ticket to China, $30,000 in cash and a thousand thumb drives. What [Motorola Solutions] found was that Huawei was stealing trade-secret and confidential files from Motorola with Chinese nationals that were our employees."[63] In 2010, Motorola filed a lawsuit alleging that Huawei was stealing its technology, and the CEO confirmed, "Huawei definitely stole trade secrets."[64]

- Quintel Technology: On information and belief, Quintel Technology Ltd. operates offices in Menlo Park, California. In 2015, Quintel filed a complaint in the United States District Court for the Eastern District of Texas against Huawei USA, Futurewei and Huawei, alleging breach of contract, misappropriation of trade secrets, and fraud, among other claims.[65] Quintel alleged that it "designs, develops, and delivers advanced high-efficiency, high-performance antenna solution for mobile operators to improve their delivery of wireless network services" and "has developed cutting-edge, proprietary antenna technology to better

---

[62] Dieter Bohn, *Cisco CEO says Huawei doesn't 'always play by the rules' of IP and security*, The Verge (Apr. 7, 2012 10:51 AM), https://www.theverge.com/2012/4/7/2931586/cisco-ceo-huawei-intellectual-propery-security.

[63] Donny Jackson, *Motorola Solutions retracts CEO Greg Brown's statements on TV about Huawei*, Urgent Commc'ns (Jan. 16, 2019) https://urgentcomm.com/2019/01/16/motorola-solutions-retracts-ceo-greg-browns-statements-on-tv-about-huawei/.

[64] Julia Limitone, *Inside business in China: Motorola Solutions CEO details Huawei theft*, FOX Business (Dec. 11, 2018), https://www.foxbusiness.com/business-leaders/inside-business-in-china-motorola-ceo-details-huawei-theft.

[65] *Quintel Tech. Ltd. v. Huawei Techs. USA, Inc.*, No. 4:15-cv-00307-GHD-CMC (E.D. Tex. May 5, 2015).

COMPLAINT

serve wireless network operators and users." The parties engaged in discussion under NDA regarding partnering together to service mobile operators in the wireless network industry. Under the NDA, Quintel shared confidential and trade secret information with Huawei, but "despite its professed interest, Huawei never intended to enter into a partnering relationship with Quintel." Instead, Futurewei filed a patent application based on Quintel's technology, including confidential and proprietary antenna technology.

- Fujitsu Network Communications: In July 2004, Fujitsu Network Communications, on information and belief headquartered in Richardson, Texas, claimed a Huawei employee was caught trying to steal information on its products at a recent Chicago trade show.[66] The employee was wearing a "Weihua" badge, and a source claimed he had a Huawei business card. The employee was discovered after-hours in Fujitsu's booth removing the casing from a $1.42 million piece of networking gear and taking photos of the circuit boards inside.

- CNEX Labs: On information and belief, CNEX is a privately held start-up company founded in 2013 in Silicon Valley, California. In 2017, Huawei filed claims of misappropriation of trade secrets against CNEX in the District Court for the Eastern District of Texas. CNEX filed counterclaims alleging misappropriation of trade secrets by Huawei. The jury ruled against Huawei and in favor of CNEX, finding that Huawei had tried to steal trade secrets.[67]

---

[66] *Huawei spy caught stealing rivals' secrets: Fujitsu*, Financial Review (Aug. 3, 2004) https://www.afr.com/technology/huawei-spy-caught-stealing-rivals-secrets-fujitsu-20040803-jltm4.

[67] Jesse Pound, *Texas jury teaches Huawei a 'hard lesson,' says US chip start-up cleared of trade secret theft*, CNBC (July 2, 2019), https://www.cnbc.com/2019/07/02/cnex-labs-ceo-texas-jury-teaches-huawei-a-hard-lesson-in-our-case.html.

78
COMPLAINT

259.   The Superseding Indictment alleges that Huawei, its parents, global affiliates and subsidiaries, including Futurewei, Huawei Device USA, and others, constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4) (also defined as the "Huawei Enterprise"). The Superseding Indictment alleges that "Huawei Enterprise was engaged in, and its activities affected, interstate and foreign commerce."

260.   The Superseding Indictment alleges the Huawei Enterprise engaged in a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), that "consisted of multiple acts indictable under Title 18, United States Code, Sections 1343 (relating to wire fraud), 1344 (relating to financial institution fraud), 1503 (relating to obstruction of justice), 1512 (relating to tampering with a witness, victim or an informant), 1832 (relating to theft of trade secrets), 1956 (relating to the laundering of monetary instruments), and 2319 (relating to criminal infringement of a copyright)."

261.   The Superseding Indictment alleges that the "principal purpose of the Huawei Enterprise was to grow the global 'Huawei' brand into one of the most powerful telecommunications equipment and consumer electronics companies in the world by entering, developing and dominating the markets for telecommunications and consumer electronics technology and services in each of the countries in which the Huawei Enterprise operated."

262.   The Superseding Indictment alleges that the Huawei Enterprise operated in several Districts in the United States, including "the Eastern District of New York, the Central District of California, the District of Columbia, the District of Delaware, the District of New Jersey, the Eastern District of Texas, the Northern District of California, the Northern District of Illinois, the Northern District of Texas, the Southern District of California, the Southern District of New York, the Western District of New York, the Western District of Washington, and elsewhere, including overseas."

263.   In a joint statement addressing the indictment, members of the Senate Intelligence Committee said, "[i]ntellectual property theft, corporate sabotage, and market manipulation are part of Huawei's core ethos and reflected in every aspect of how it conducts business. It uses these tactics indiscriminately against competitors and collaborators alike."[68]

264.   According to the Department of Justice, "Huawei's efforts to steal trade secrets and other sophisticated U.S. technology were successful," and the company "obtained nonpublic intellectual property relating to internet router source code, cellular antenna technology and robotics" to gain an "unfair competitive advantage" over competitors.[69]

## FIRST CLAIM FOR RELIEF

### (Antitrust Monopolization in Violation of Section 2 of the Sherman Act)

265.   NETGEAR re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

266.   This is an action for antitrust monopolization in violation of Section 2 of the Sherman Act.

267.   On information and belief, Huawei has undertaken an obligation, in accordance with the relevant rules and IPR polices of applicable SSOs, to grant licenses on RAND terms and conditions.

268.   On information and belief, Huawei is asserting that certain patents that have been asserted against NETGEAR are essential to the IEEE 802.11 standard.

269.   As a member of IEEE and an active participant in 802.11 consensus standardization, Huawei was obligated to comply with the IEEE's Patent Policy and

---

[68] *Statement of Sens. Warner and Burr on Eastern District of New York Indictment Against Huawei* (Feb. 13, 2020), https://www.warner.senate.gov/public/index.cfm/2020/2/statement-of-sens-warner-and-burr-on-eastern.

[69] *Chinese Telecommunications Conglomerate Huawei and Subsidiaries Charged in Racketeering Conspiracy and Conspiracy to Steal Trade Secrets*, U.S. Att'y's Off., E.D.N.Y. (Feb. 13, 2020), https://www.justice.gov/usao-edny/pr/chinese-telecommunications-conglomerate-huawei-and-subsidiaries-charged-racketeering.

COMPLAINT

Procedures.

270.    Huawei submitted LOAs to IEEE on January 6, 2007 and August 13, 2007 with the commitments identified above.

271.    On May 28, 2019, Huawei submitted a declaration to the IEEE indicating that it "may own, control, or have the ability to license Patent Claims that might be or become Essential Patent Claims" to the Wi-Fi 6 standard (802.11 ax). Huawei declared that it was "unwilling or unable to grant licenses" on "a worldwide basis with reasonable terms that are demonstrably free of unfair discrimination to make, have made, use, sell, offer to sell, or import any Compliant Implementation that practices the Essential Patent Claims for use in conforming with the IEEE Standard" 802.11ax (Wi-Fi 6), 802.11ay, 802.11aj, 802.11ba.

272.    On July 25, 2019, Huawei reversed course and submitted a Letter of Assurance to the IEEE stating that it "will grant a license under reasonable rates to an unrestricted number of applicants on a worldwide basis with reasonable terms and conditions that are demonstrably free of unfair discrimination" and that declaration related to Huawei's Wi-Fi 6 standard essential patents (802.11 ax) and Huawei's 802.11 aj standard essential patents. On the same say, Huawei submitted an identical declaration related to Huawei's Pre-Wi-Fi 6 standard essential patents (802.11-1997, 802.11-1999, 802.11-2007, 802.11-2012, and 802.11-2016). These so-called custom LOAs refer back to a prior version of the IEEE IPR policy.

273.    Over time, to secure the inclusion of its proposed technology in the evolving Wi-Fi 6 standards and other Pre-Wi-Fi 6 technology allegedly covered by its patents, Huawei submitted LOAs, which promised to license its patents on RAND terms and conditions. As a result of Huawei's IPR disclosures, Huawei's alleged patented technology was incorporated into the standards, and other alternative technologies that might otherwise have been considered for inclusion in the standard were not adopted.

274.    Through the submission of LOAs to IEEE, Huawei incurred a duty to

negotiate with potential licensees such as NETGEAR and to provide licenses on fair, reasonable and non-discriminatory terms.

275. By submitting LOAs, Huawei agreed to provide implementers, such as NETGEAR, licenses on reasonable terms and provide terms that are demonstrably free of discrimination.

276. Once IEEE adopts technology for a Wi-Fi standard, the owner of each essential patent whose technology is incorporated into that standard obtains monopoly power in a relevant technology market. When patented technology is incorporated into a standard, adoption of the standard eliminates alternatives to the patented technology, and companies wanting to market devices that comply with the standard are locked in and must use the SEPs.

277. Huawei holds monopoly power in the relevant market (defined below), assuming Huawei's contention is correct and it holds patents essential to relevant IEEE standards. Because, as Huawei contends, its patents cover technologies incorporated into the relevant IEEE standards, Huawei has the power to raise prices and exclude competition for the technologies covered by its SEPs. Adherents to the relevant IEEE standards are locked-in. Barriers to entry into the market are high because, among other things, lock-in means that post-standardization, other technologies are no longer viable substitutes for the technologies specified in the relevant standards, whether it be particular hardware or functionalities specified in the relevant standards. By asserting that NETGEAR and others must license its SEPs, including in the U.S., Huawei can extract royalties or other licensing terms that far exceed what Huawei could have received before the IEEE standardized the technology that Huawei now claims its SEPs cover.

278. The relevant market in which to assess the anticompetitive effects of Huawei's conduct are the markets for technologies that, before the IEEE 802.11 and its predecessors were implemented, were competing to perform the various functions alleged to be covered by Huawei's purported essential patents for the IEEE 802.11

COMPLAINT

standard and its predecessor Wi-Fi standards ("Relevant Wi-Fi Market.") The functionality for the IEEE 802.11 standards provided by each relevant access point or modem Wi-Fi technology, therefore, comprises its own relevant market for antitrust purposes. ███████████████████████████████████ ███████████████████████ which included Wi-Fi 6 and Pre-Wi-Fi 6 claim charts, and their reasonable equivalents constitute the Wi-Fi technology market. Before standardization, implementers like NETGEAR in these markets were the companies supplying technologies capable of performing the relevant functions incorporated into the IEEE 802.11 standard. After standardization, the holder of essential patents covering the technology that performs a given function holds a monopoly in the Relevant Wi-Fi Market. This monopoly exists because, post-standardization, formerly viable alternative technologies are no longer viable because of the "lock-in" effect created by Huawei's deceptive standardization practices. NETGEAR has been improperly excluded from the Relevant Wi-Fi Market because it cannot access purported essential technology on RAND terms.

279. Huawei's promises to license its allegedly essential patents on RAND terms and conditions were and remain intentionally false and misleading. Huawei had no intention of licensing its Wi-Fi 6 SEPs and Pre-Wi-Fi SEPs on RAND terms and conditions and instead intended to wrongfully dominate the market. Indeed, the facts concerning the discussions between Huawei and NETGEAR, discussed above, demonstrate that Huawei engaged in "take it or leave it" negotiation tactics and did not demonstrate a willingness to fairly negotiate throughout the discussions between the parties.

280. Huawei is thus attempting to exploit its undue monopoly power by attempting to extract supracompetitive royalty rates from NETGEAR and to charge NETGEAR exorbitant royalty rates for invalid patents and patents that are non-essential to IEEE standards, all the while refusing to provide evidence of comparable licenses or other forms of evidence to demonstrate the reasonable and non-

discriminatory nature of the proposed RAND rates.

281. Huawei has obtained and maintained its market power in the Relevant Wi-Fi Market willfully and not due to a superior product, business acumen, or historic accident. Huawei excluded competition through its intentionally false promises, made shortly after refusing to offer licenses on reasonable terms, to license the relevant technologies on RAND terms, which IEEE, its members and implementers relied on in choosing to incorporate standard-compliant technology.

282. Huawei's deceptive conduct induced IEEE, through the voluntary consensus-driven processes used by IEEE, to incorporate technology into the Wi-Fi 6 standards that they would not have incorporated absent a RAND commitment. Huawei's LOAs to IEEE impose stringent requirements on Huawei's conduct in licensing patents essential to an IEEE standard, requirements that Huawei has knowingly ignored.

283. Implementers like NETGEAR invested significant revenue and other resources in developing products that practice the Wi-Fi 6 standards and Pre-Wi-Fi 6 standards. Those investments relied on the express commitment Huawei and other SEP owners made to license their patents on RAND terms and conditions. NETGEAR and other implementers were effectively locked into practicing Huawei's technology when it was adopted into the standards, and, as a result, alternatives to the patented technologies no longer constrain Huawei's ability to demand royalty rates far in excess of the value of the patented technologies, as the alternative technologies would have done prior to the adoption of the standard ("ex ante").

284. Upon information and belief, Huawei engaged in an unlawful scheme to exploit its undue market power over technologies necessary for implementers, including NETGEAR, to "lock in" and practice certain Wi-Fi standards. Huawei's market power is due solely to its false commitments to license its alleged SEPs on RAND terms and conditions, which was a necessary step in wrongly locking its technology into the standard(s) so that it could engage in abusive licensing practices

by seeking non-RAND royalties unsupported by the actual value of its global SEP portfolio.

285.   After acquiring its unlawful monopolization of the Relevant Wi-Fi Markets, Huawei has exploited this ill-gotten power against NETGEAR by refusing to offer a license on RAND terms, by among other things:

- Refusing to negotiate pursuant to its duty to negotiate under the rules established by IEEE in exchange for rights afforded by LOAs;
- Refusing to honor its obligation to license its alleged SEPs on RAND licensing rates by attempting to seek supracompetitive royalty rates from NETGEAR;
- Refusing to provide proof that licensing terms and conditions are demonstrably free from discrimination; and
- Seeking an injunction in Dusseldorf, Germany proceedings before performing any IEEE obligations created by the LOAs.

286.   Huawei's abusive licensing actions reveal that it never intended to comply with its promises to license its allegedly essential patents on RAND terms and conditions. Huawei has refused to engage with NETGEAR's good-faith efforts to determine reasonable and non-discriminatory terms and conditions. Instead, Huawei has consistently insisted that NETGEAR pay royalty rates significantly higher than justified by the strength of Huawei's SEPs while refusing to provide comparable licenses and other measurable tools that would assist NETGEAR in fairly assessing the value of Huawei's relevant patents. Moreover, Huawei took its anticompetitive abusive licensing practices a step further here by insisting that NETGEAR requires a license to patents covered by or exhausted by a license entered into between Huawei and NETGEAR's supplier Qualcomm, while at the same time knowing, upon information and belief, that NETGEAR was licensed to Huawei's patents through the Qualcomm license. *See infra* ¶¶ 348-59.

287.   Huawei also engages and continues to engage in a long-running scheme

of asserting certain patents in the Relevant Wi-Fi Market area that it contends are standard essential but then refusing to offer a license on RAND terms and tying any potential license to a license to its entire Wi-Fi portfolio, all in furtherance of Huawei's antitrust scheme.

288.   Huawei's unlawful conduct has had, and will continue to have, a substantial anti-competitive effect on the Relevant Wi-Fi Markets.

289.   These anti-competitive acts are an abuse of Huawei's monopoly power in the relevant worldwide markets and establish a violation of Section 2 of the Sherman Act.

290.   As a direct and proximate consequence of Huawei's unlawful monopolization, customers of the Relevant Wi-Fi Market (implementers of the standards such as NETGEAR) face drastically higher costs for access to Wi-Fi technologies necessary for the manufacture of standard-compliant products than they would have paid in a competitive marketplace. Moreover, Huawei's unlawful conduct alleged herein has caused and continues to cause harm to legitimate competition, including by improperly increasing barriers to entry such that potential competitors who would or might have produced products based on the IEEE standards have been dissuaded from doing so and/or making investments in such activities. Huawei has carried out this unlawful conduct by forcing unnecessary expenditures by competitors or potential competitors who are unwilling to surrender to Huawei's extortionate scheme to extract licensing revenue for patents that Huawei has asserted in bad faith. Huawei perpetrated this bad faith conduct to extract improper license payments through the improper negotiation tactics discussed herein, resulting in a decrease or elimination of competition from alternative technologies that would or might have had increased viability but for Huawei's unlawful conduct. These harmful effects will continue unabated unless Huawei's continuing campaign of unlawful conduct is put to a stop.

291.   The antitrust injuries associated with Huawei's unlawful monopolization

COMPLAINT

also extend to consumers in the downstream market for the technology, such as NETGEAR's access points and modems, in the form of higher prices, reduced innovation, and more limited choice for such standard-compliant products. Indeed, the necessary result of raising costs to some competing manufacturers in the marketplace for standard-compliant products and diverting resources that otherwise would have fueled additional innovation is to limit consumer choices in complementary technologies and other technologies used in standard-compliant products.

292.   Huawei has leverage over manufacturers of standard-compliant products that it would not possess but for its false promises to IEEE to license its alleged SEPs on RAND terms and conditions and its unlawful acquisition of monopoly power in the Relevant Wi-Fi Market. As a result of said leverage, manufacturers of standard-compliant products, including NETGEAR, must either capitulate to Huawei's demand for supracompetitive royalty rates or face the threat of injunction and the costs and risks of protracted patent litigation on a global scale.

293.   The above-described anti-competitive acts are an abuse of Huawei's monopoly power in the relevant worldwide markets and establish a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

294.   Besides the harm to competition by improperly increasing barriers to entry described above, Huawei's violations of Section 2 of the Sherman Act have caused direct injury to NETGEAR, including by forcing NETGEAR to incur great expense in defending against Huawei's bad faith assertions of its purported patents in Germany, the UPC and China, and also through the loss of past, present and future profits and other harm to NETGEAR's business.

295.   Huawei's violations of Section 2 of the Sherman Act have further caused injury to NETGEAR in its business and property in the form of loss of goodwill, embarrassment and reputational harm.

296.   Huawei's acts, practices and conduct have caused NETGEAR to suffer irreparable injuries that will continue until and unless the Court enjoins Huawei's

harmful acts, practices and conduct within the U.S. market.[70]

297.   Huawei's anti-competitive conduct has affected and is affecting a substantial volume of interstate and foreign commerce, including commerce in this district.

298.   Therefore, to prevent harm to NETGEAR's business and property, including its wireless router and access point Wi-Fi products, and further harm to competition and consumers more generally in the Relevant Wi-Fi Market, NETGEAR brings this action for treble damages and injunctive relief under Sections 4 and 16 of the Clayton Act. 15 U.S.C. §§ 15, 26.

**SECOND CLAIM FOR RELIEF**

**(Antitrust Attempted Monopolization**

**in Violation of Section 2 of the Sherman Act)**

299.   NETGEAR re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

300.   Huawei has willfully engaged in the anticompetitive conduct described above with the specific intent to acquire and maintain market power in a relevant antitrust market—namely, the relevant Wi-Fi Technology market—and destroy competition therein. There is a dangerous probability that, unless restrained, Huawei's conduct will succeed, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

301.   Huawei's violations of Section 2 of the Sherman Act caused and continue to cause harm to competition, including by improperly increasing barriers to entry such that potential competitors who would or might have produced products designed based upon the accused standards have been dissuaded from doing so and/or making investments in such activities, by forcing unnecessary defense expenditures by competitors or potential competitors who are unwilling to surrender to Huawei's extortionate scheme, by facilitating Huawei's demand for and extraction of improper

---

[70] Any request for judicial decree or relief from Huawei's unlawful conduct is not and is not intended to have the effect of an anti-suit injunction or equivalent thereof.

supracompetitive license payments when Wi-LAN is not properly entitled to any such license payments including because NETGEAR possesses an implied license to all of Huawei's patents, by causing increased prices to consumers for products designed based upon the accused standards as a result of unnecessary defense expenditures and/or exorbitant licensing fees for those who accede to Huawei's improper demands, by chilling participation in the markets in which it operates and related markets, and by decreasing or eliminating competition from alternative technologies that would or might have had increased viability but for Huawei's exclusionary conduct. In addition, Huawei's abuse of the standards-setting process also damages competition through chilling effects on standards participation, thereby reducing or eliminating the pro-competitive impacts that standards organizations can have in the right circumstances when the process is not abused.

302.   Huawei's violations of Section 2 of the Sherman Act have also caused injury to NETGEAR in its business and property, including by forcing NETGEAR to incur great expense in defending against Huawei's bad faith assertion of patents in Germany, China and the UPC, and also through the loss of past, present and future profits and other harm to NETGEAR's business. NETGEAR has suffered irreparable injury by reason of the acts, practices and conduct of Huawei alleged herein, and will continue to suffer such injury until and unless the Court enjoins such acts, practices and conduct within the United States market.[71]

303.   Huawei's anticompetitive conduct has affected and is affecting a substantial volume of interstate and foreign commerce, including commerce in this District.

**THIRD CLAIM FOR RELIEF**

**(Civil RICO Violations Under 18 U.S.C. §§ 1964 and 1962(c))**

304.   NETGEAR re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

---

[71] *Supra note* 78.

89
COMPLAINT

305.   This is an action for civil relief under 18 U.S.C. §§ 1961 *et seq.*

306.   18 U.S.C. § 1964 creates a private cause of action for persons and entities injured by violations of 18 U.S.C. § 1962 (the federal Racketeer Influenced & Corrupt Organizations Act ("RICO")).

307.   Huawei is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962. Huawei willfully conducts and directs the affairs of the Huawei Enterprise, as defined herein. Huawei violated 18 U.S.C. § 1962(c) by participating in and conducting the affairs of the Huawei Enterprise through a pattern of racketeering activity outlined herein.

308.   NETGEAR is a "person injured in his or her business or property" by reason of Huawei's violation of 18 U.S.C. § 1962(c) within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

309.   Huawei and its parents, global affiliates and subsidiaries, including Futurewei, Huawei USA, Huawei Devices USA, and others, constitute an "enterprise" and a group of legal entities associated in fact as defined in 18 U.S.C. § 1961(4) (the "Huawei Enterprise"), which has conducted its affairs through a pattern of racketeering activity, and whose conduct and activities affect interstate or foreign commerce. These entities are associated for the common purpose of engaging in unlawful conduct to grow the global "Huawei" brand into one of the most powerful telecommunications equipment and consumer electronics companies in the world by entering, developing and dominating the markets for telecommunications and consumer electronics technology and services in each of the countries in which the Huawei Enterprise operated and operates. The Huawei Enterprise is managed by Huawei, has an ongoing organization with an ascertainable structure that functions as a continuing unit with separate roles and responsibilities, and has the longevity necessary to accomplish this common purpose.

310.   On information and belief, the Huawei Enterprise has operated and is operating in several Districts in the United States, including the Eastern District of

New York, the Central District of California, the District of Columbia, the District of Delaware, the District of New Jersey, the Eastern District of Texas, the Northern District of California, the Northern District of Illinois, the Northern District of Texas, the Southern District of California, the Southern District of New York, the Western District of New York, the Western District of Washington, and elsewhere, including overseas.

311. The Huawei Enterprise engages in and its activities have an effect on interstate and foreign commerce by participating in SSOs and making fraudulent commitments to license Huawei's patents on RAND terms and conditions, seeking supracompetitive and non-RAND licensing rates and royalties, seeking conditions that the Huawei Enterprise is legally prohibited from seeking under RAND, and stealing intellectual property from United States companies. On information and belief, the Huawei Enterprise has targeted dozens of United States companies headquartered or with offices in several states, each engaged in interstate and foreign commerce. The Huawei Enterprise uses the instrumentalities of interstate and foreign mailings and wires to further its unlawful conduct.

312. In violation of 18 U.S.C. § 1962(c), Huawei, with Huawei USA, Huawei Devices USA, and Futurewei, and those acting at their direction, have conducted, controlled, and participated in the conduct of the Huawei Enterprise's affairs through a pattern of racketeering activity.

313. The pattern of racketeering activity referred to herein consists of multiple unlawful schemes that were and are specifically intended to and do use unlawful means and influence to enrich Huawei and the Huawei Enterprise at the expense of NETGEAR and others, including United States victim companies. These unlawful schemes involved, for instance, acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, theft of trade secrets in violation of 18 U.S.C. § 1832, and criminal copyright infringement in violation of 18 U.S.C. § 2319.

314. As alleged herein, Huawei, individually and through the conduct of the

91
COMPLAINT

Huawei Enterprise, including in concert with Huawei USA, Huawei Devices USA, and Futurewei, beginning in or about 2006 and continuing to present, in California, Texas, and elsewhere in the United States, did engage in numerous acts of mail and wire fraud and/or knowingly and intentionally devise and participate in an overall scheme or artifice to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises or omitted facts, and is attempting to commit fraud and carry out such scheme, in violation of 18 U.S.C. §§ 1341 and 1343. These acts constitute "predicate acts" under 18 U.S.C. § 1961 in furtherance of the unlawful purpose to grow the global "Huawei" brand and illegally dominate the markets globally, including:

- As described in paragraphs 101-170, operating a scheme to defraud by which Huawei participates in IEEE and induces the IEEE to include Huawei's alleged SEPs in the 802.11 standards by fraudulently and falsely making material commitments sent via mail and/or wire to IEEE in the United States to license any SEPs under RAND terms and conditions, further inducing NETGEAR and others to incorporate the 802.11 standard technology in products for sales worldwide to "lock" them in to the technology, using mail and/or wire in interstate and foreign commerce to demand supracompetitive and exorbitant licensing rates from NETGEAR in furtherance of the scheme to defraud, and unlawfully seeking non-RAND rates and conditions that Huawei, and the Huawei Enterprise, are legally prohibited from seeking pursuant to RAND obligations.

- As described in paragraphs 138-158 and 171-186, operating a scheme to defraud by which Huawei participates in ITU-T, and induces the ITU-T to include Huawei's alleged SEPs in the standards by fraudulently and falsely making material commitments to license any SEPs under RAND terms and conditions, further inducing ADVA and others to incorporate the standardized technology in products for sales worldwide to "lock" them in to

92
COMPLAINT

the technology, using mail and/or wire in interstate and foreign commerce to demand supracompetitive and exorbitant licensing rates from ADVA in furtherance of the scheme to defraud, and unlawfully seeking non-RAND rates and conditions that Huawei, and the Huawei Enterprise, are legally prohibited from seeking pursuant to RAND obligations.

- As described in paragraphs 138-158 and 187-213, operating a scheme to defraud by which Huawei participates in ITU-T, and induces the ITU-T to include Huawei's alleged SEPs in the standards by fraudulently and falsely making material commitments to license any SEPs under RAND terms and conditions, further inducing Verizon and others to incorporate the standardized technology in products for sales worldwide to "lock" them in to the technology, using mail and/or wire in interstate and foreign commerce to demand supracompetitive and exorbitant licensing rates from Verizon in furtherance of the scheme to defraud, and unlawfully seeking non-RAND rates and conditions that Huawei, and the Huawei Enterprise, are legally prohibited from seeking pursuant to RAND obligations.

- As described in paragraphs 138-158 and 214-231, operating a scheme to defraud by which Huawei participates in ETSI, and induces the ETSI to include Huawei's alleged SEPs in the standards by fraudulently and falsely making material commitments to license any SEPs under RAND terms and conditions, further inducing Harris Corporation and/or L3Harris, and others to incorporate the standardized technology in products for sales worldwide to "lock" them in to the technology, using mail and/or wire in interstate and foreign commerce to demand supracompetitive and exorbitant licensing rates from Harris Corporation and/or L3Harris in furtherance of the scheme to defraud, and unlawfully seeking non-RAND rates and conditions that Huawei, and the Huawei Enterprise, are legally prohibited from seeking pursuant to RAND obligations.

COMPLAINT

- As described in paragraphs 138-158 and 232-253, operating a scheme to defraud by which Huawei participates in ITU-T, and induces the ITU-T to include Huawei's alleged SEPs in the standards by fraudulently and falsely making material commitments to license any SEPs under RAND terms and conditions, further inducing T-Mobile and others to incorporate the standardized technology in products for sales worldwide to "lock" them in to the technology, using mail and/or wire in interstate and foreign commerce to demand supracompetitive and exorbitant licensing rates from T-Mobile in furtherance of the scheme to defraud, and unlawfully seeking non-RAND rates and conditions that Huawei, and the Huawei Enterprise, are legally prohibited from seeking pursuant to RAND obligations.

- As described in paragraphs 138-254, on information and belief, operating a scheme to defraud by which Huawei participates in SSOs and induces the SSO to include Huawei's alleged SEPs in the standards by fraudulently and falsely making material commitments to license any SEPs under RAND terms and conditions, further inducing companies headquartered or with offices in the United States and others to incorporate the standardized technology in products for sales worldwide to "lock" them in to the technology, using mail and/or wire in interstate and foreign commerce to demand supracompetitive and exorbitant licensing rates from United States companies in furtherance of the scheme to defraud, and unlawfully seeking non-RAND rates and conditions that Huawei, and the Huawei Enterprise, are legally prohibited from seeking pursuant to RAND obligations.

315. Huawei and the Huawei Enterprise devised and furthered the schemes to defraud by use of mail, telephone, and Internet, and transmitted or caused to be transmitted, by means of mail and/or wire communications traveling in interstate and foreign commerce, or acted knowing that the use of mail and/or wire in interstate and foreign commerce in furtherance of its scheme to defraud would follow in the

94
COMPLAINT

ordinary course of business and could be reasonably foreseen, writing(s) and/or signal(s), including as described above, Huawei's LOAs to the IEEE and similar commitments to SSOs, and the Huawei Enterprise's communications with NETGEAR, ADVA, Verizon, Harris Corporation/L3Harris and T-Mobile, and on information and belief, other companies headquartered or with offices in the United States.

316. As demonstrated by its pattern of non-RAND licensing negotiations and coercive threats of injunctions and litigation, Huawei intends to deceive and injure NETGEAR and other United States victim companies through its fraudulent LOAs and similar RAND commitments. Huawei's misrepresentations and fraudulent commitments to the IEEE and other SSOs are material as the IEEE, SSOs and companies globally relied on these misrepresentations in incorporating Huawei's alleged SEP technology in the standards and in products sold worldwide, thus becoming "locked in" to the technology and exposing the companies to "hold up" demands and exorbitant licensing fees. Instead of Huawei complying with its RAND obligations and seeking reasonable and non-discriminatory rates, companies are required to engage in costly litigation and face exclusion from the market, or pay Huawei's exorbitant demands, ultimately diminishing their place in the market due to these supracompetitive and illegal licensing costs. Huawei's predatory and coercive negotiation tactics have yet another layer here, as Huawei has demanded supracompetitive illegal costs from NETGEAR while knowing, on information and belief, that NETGEAR was impliedly licensed to Huawei's patents through Huawei's license with Qualcomm. *See infra* ¶¶ 348-59.

317. As alleged herein, Huawei, individually and through the conduct of the Huawei Enterprise, including in concert with Huawei Devices USA, Futurewei and others, engaged in multiple thefts of intellectual property beginning in 2000, including theft of trade secrets in violation of 18 U.S.C. § 1832 and criminal copyright infringement in violation of 18 U.S.C. § 2319, which constitute "predicate acts" under

95
COMPLAINT

18 U.S.C. § 1961 in furtherance of the unlawful purpose to grow the global "Huawei" brand and illegally dominate the markets globally.

318. Huawei's multiple fraudulent commitments to SSOs and United States companies, and uses of mail and/or wire in interstate and foreign commerce to commence and further its schemes to defraud, and its multiple thefts of intellectual property are substantially similar such that they constitute a pattern of racketeering activity under 18 U.S.C. § 1961(5).

319. As described throughout the Complaint, Huawei and the Huawei Enterprise are and have engaged in a pattern of related and continuous predicate acts. The predicate acts constitute a variety of unlawful activities directed to the misappropriation of intellectual property rights, each conducted with the common purpose and overarching scheme to injure American competition and dominate markets globally. The predicate acts have had the same or similar results of depriving or attempting to deprive victims of intellectual property rights, same participants, same United States victim companies, and the same methods of deceptive commission. The predicate acts are and were related and are not isolated events.

320. Huawei was an owner of or associated with the Huawei Enterprise, which is engaged in, or the activities of which affect, interstate commerce, and Huawei conducted or participated, directly or indirectly, in the conduct of the Huawei Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(5) and 1962(c).

321. Each of the foregoing acts of racketeering by the Huawei Enterprise is related, continuous, ongoing and part of a pattern of conduct pertaining to intellectual property, directed to multiple United States victim companies, and continuing since at least the early 2000s. Accordingly, Huawei is engaging in a continuing and related pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(5), which poses the threat of continued unlawful activity.

322. As a direct and proximate result of Huawei's intentional conduct and

RICO violation, NETGEAR was and is currently being damaged in its business and property, including in the United States, and is entitled to all remedies available under the law. As an intended, actual and proximate consequence of Huawei's unlawful conduct, NETGEAR has incurred significant fees and costs in investigating and defending against Huawei's unlawful non-RAND demands, including fees and costs with respect to investigating and defending Huawei's actions in Germany, the Unified Patent Court, and China.

323.   In addition, NETGEAR has incurred significant costs associated with significant disruption to its business, disruption of commercial relationships between NETGEAR and customers and/or potential customers, and other disruptions to NETGEAR caused by Huawei's unlawful conduct. NETGEAR has been harmed by lost sales during the time it was ███████████████████████ due to Huawei's unlawful injunction demand. NETGEAR has also been harmed to the extent that the costs of any license or other fees and expenses exceed the value of a RAND license. NETGEAR has further been injured commercially and financially by the threat of injunctions and forfeiture of property incident to any conduct other than giving in to Huawei's unlawful licensing demands and allegations.

324.   As a result of Huawei's violations of 18 U.S.C. § 1962(c), NETGEAR has suffered substantial damages, in an amount to be provided at trial. Pursuant to 18 U.S.C. § 1964(c), NETGEAR is entitled to recover treble its general and special compensatory damages, plus interests, costs, and attorneys' fees, incurred by reason of Huawei's violations of 18 U.S.C. § 1962(c).

## FOURTH CLAIM FOR RELIEF

### (Civil RICO Violations Under 18 U.S.C. §§ 1964 and 1962(d))

325.   NETGEAR re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

326.   This Claim alleges RICO Conspiracy violations as provided in 18 U.S.C. § 1962(d) against Huawei.

327.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

328.    Huawei has violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c) with Huawei USA, Huawei Device USA, and Futurewei. The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs described previously through a pattern of racketeering activity.

329.    The nature of the acts and material misrepresentations in furtherance of the conspiracy indicates that Huawei, Huawei USA, Huawei Device USA, and Futurewei not only agreed to the objective of an 18 U.S.C. § 1962(d) violation by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

330.    As a direct and proximate result of Huawei, Huawei USA, Huawei Device USA, and Futurewei's overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), NETGEAR has been and is continuing to be injured in its business and property in an amount to be determined at trial.

331.    On account of Huawei and the Huawei Enterprise's fraudulent schemes, NETGEAR has been injured in the United States, including but not limited to money expended in and responding to and defending itself from Huawei's actions in Germany, the Unified Patent Court, and China. NETGEAR has also incurred significant business disruption as described above and in investigating, responding and defending itself from Huawei's actions in Germany, the Unified Patent Court, and China. NETGEAR has been harmed by lost sales during the time it was ███████ ████████████████████████████████ due to Huawei's unlawful injunction demand.

332.    Huawei sought to and has engaged in the commission of and continues to commit overt acts, including the predicate acts of mail and wire fraud under 18 U.S.C.

§§ 1341 and 1343 that constitute a pattern of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1), (5).

## FIFTH CLAIM FOR RELIEF

### (Breach of Contract Based on IEEE RAND Obligations)

333.   NETGEAR realleges and incorporates by reference each of the foregoing paragraphs.

334.   Huawei entered into express or implied contractual commitments with IEEE, its members and adopters and prospective users of the relevant Wi-Fi standards, including by submitting LOAs related to its Wi-Fi SEPs.

335.   Huawei's LOAs submitted to, and accepted by, IEEE created an enforceable contract between Huawei and IEEE. The IEEE's rules and policies, whether formal or informal, including all requirements and representations, constitute an enforceable contract between Huawei and IEEE.

336.   Members of the IEEE and adopters and prospective users of IEEE standards, including NETGEAR, are third-party beneficiaries of those contracts. Huawei's commitments to the IEEE are for the direct benefit of potential licensees, including NETGEAR, and are designed to ensure that Huawei's SEPs are readily accessible to potential licensees at reasonable rates with reasonable terms and conditions that are demonstrably free of any unfair discrimination.

337.   Huawei is contractually obligated, among other things, to offer a license to its SEPs to NETGEAR consistent with the IEEE's IPR Policy and Huawei's LOAs, including that such a license is on RAND terms and conditions.

338.   NETGEAR, as a third-party beneficiary, was entitled to rely on Huawei's RAND contractual obligations.

339.   Huawei breached its contractual obligations by, among other things, (i) failing and refusing to license its Wi-Fi SEPs on RAND terms and conditions, (ii) seeking excessive and/or blatantly unreasonable royalty rates, (iii) failing to make a good faith RAND offer, (iv) refusing to negotiate fairly and engaging in hold-up, (v)

demanding exorbitant royalties relative to the contribution of any purported "essential" technology and patents, (vi) engaging in a lack of transparency and fairness in negotiation by, for example, refusing to provide sufficient details regarding comparable licenses, (vii) providing no representative claim charts or identification of relevant patents before filing actions in Germany and China seeking injunctive relief, (viii) filing and maintaining an action in Germany seeking to stop NETGEAR's implementation of the technology of the allegedly essential patents and to exclude NETGEAR from, among other things, importing, selling for importation, selling after importation and selling products that incorporate such technology, prior to offering NETGEAR licenses to the relevant patents, under reasonable rates with reasonable terms, and on a non-discriminatory basis, and (ix) seeking royalties from NETGEAR for products containing Qualcomm modem chipsets.

340.   Huawei has refused to engage in good-faith negotiations, opting instead for a "take it or leave it" hold-up approach. On top of this, Huawei breached its agreement to provide licenses with RAND terms by contending that NETGEAR requires a license to patents covered by or exhausted by a license entered into between Huawei and Qualcomm while knowing, upon information and belief, that NETGEAR was impliedly licensed to Huawei's patents and Huawei's patent rights were exhausted through the Qualcomm license. *See infra* ¶¶ 348-59.

341.   Huawei's actions have violated the implied duty of good faith and fair dealing inherent in every contract.

342.   Huawei's actions threaten to prevent NETGEAR's implementation of the technology of the allegedly "essential" patents should NETGEAR refuse to pay Huawei grossly excessive royalties, which would prevent NETGEAR from making, using, selling, and importing products that incorporate such technology.

343.   As a direct and necessary result of Huawei's contractual breaches, NETGEAR has been injured in its business or property, has been forced to expend substantial resources negotiating with Huawei, and is threatened by an imminent loss

of profits, potential liability in Germany and elsewhere, loss of customers and potential customers, and loss of goodwill and product image in a manner that was actually foreseen, or was reasonably foreseeable, by Huawei at the time Huawei's contractual commitments with the IEEE were formed.

344.   Huawei's refusal to offer a license to NETGEAR on RAND terms and conditions has deprived NETGEAR of its right to obtain a license to Huawei's Wi-Fi SEPs and exposed NETGEAR to the risk of future patent infringement claims by Huawei.

345.   Huawei's licensing offers to NETGEAR violated its commitments to the IEEE and are entirely inconsistent with RAND principles. Huawei has negotiated in bad faith and has attempted to maximize the hold-up value it can extract from NETGEAR.

346.   On information and belief, Huawei is attempting to exploit the power it gained through its involvement with working groups and the standardization of its patents to demand grossly excessive royalty rates that are wholly disproportionate to the value of any technical contribution of its alleged SEPs.

347.   NETGEAR has suffered and will suffer injury, in fact, by reason of Huawei's unlawful, unfair and fraudulent acts and has lost, and continues to lose, money or property.

## SIXTH CLAIM FOR RELIEF

### (Declaratory Judgment of Implied License and/or Exhaustion)

348.   NETGEAR incorporates all allegations contained in this Complaint.

349.   An actual controversy exists between NETGEAR and Huawei concerning whether any patent rights held by Huawei are subject to an implied license and/or exhausted under the Qualcomm License.[72]

---

[72] On information and belief, there may be other agreements between Huawei and Qualcomm concerning Huawei patents that have not been made available to NETGEAR by Huawei or Qualcomm.

101
COMPLAINT

350.   Huawei has asserted that NETGEAR requires a worldwide license to certain Huawei patents because, among other things, NETGEAR's products practice certain standards, including the Wi-Fi 6 standard (IEEE 802.11 ax specification) and Pre-Wi-Fi 6 standards (which include all IEEE 802.11 series standard specifications finally approved or adopted by IEEE, and published in their final form before the release date of final form of the Wi-Fi 6 standard and include IEEE 802.11n and IEEE 802.11ac specifications).

351.   NETGEAR, directly or through retailers, sells and has sold products in the United States, California and this District that comply with the Wi-Fi 6 standard and Pre-Wi-Fi 6 standards. Such products include, at least in part, the products identified in Huawei's July 9, 2020, letter to NETGEAR identified above. Huawei has asserted that these products infringe Huawei's patents because these products practice the identified standards.

352.   NETGEAR purchases modem chipsets from Qualcomm. NETGEAR places Qualcomm's modem chipsets in NETGEAR's products, including NETGEAR's Orbi products and mobile hotspots. NETGEAR's products implement the Wi-Fi 6 and Pre-Wi-Fi 6 functionality through the incorporation of the modem chipsets purchased from Qualcomm. Qualcomm's modem chips include features and functionality for practicing the Wi-Fi standards that Huawei claims necessitate a license from NETGEAR. Upon integration into NETGEAR's electronic device, Qualcomm's modem chipsets facilitate the provision of a wireless local area network to client devices (e.g., any computer hardware or software that requests access to the local area network).

353.   NETGEAR purchases modem chipsets from Qualcomm that provide both 4G/5G and Wi-Fi functionalities. NETGEAR places these modem chipsets, for example, in NETGEAR's mobile hotspot products sold under the Nighthawk brand. NETGEAR's products implement the 4G/5G and Wi-Fi functionality through the incorporation of the modem chipsets purchased from Qualcomm. Qualcomm's

COMPLAINT

modem chips include features and functionality for practicing the standards and patents that Huawei claims necessitate a license from NETGEAR.

354.   As part of the parties' licensing negotiations, NETGEAR informed Huawei that NETGEAR purchased modem chipsets from Huawei's licensee, Qualcomm. NETGEAR further informed Huawei that NETGEAR believed that Qualcomm's sales of chips to NETGEAR, at minimum, exhausted Huawei's rights in patents that Huawei claimed NETGEAR required a license to. NETGEAR requested Huawei to provide NETGEAR with a copy of the Qualcomm License. Contrary to the actions of a willing licensor, Huawei refused to provide NETGEAR with a copy of the Qualcomm License. Huawei's refusal forced NETGEAR to initiate Section 1782 proceedings in the United States District Court for the Southern District of California (Case No. 23-MC-794-BLM) by which NETGEAR sought discovery from Qualcomm, i.e., concerning all agreements between Qualcomm and Huawei, including the Qualcomm License, for use in the German proceedings. Qualcomm provided certain agreements to NETGEAR. Thereafter, in the German proceedings, NETGEAR then filed an Appeal Response on October 31, 2023, laying out the specifics of the exhaustion issue.

355.   On information and belief, any claim by Huawei that NETGEAR infringes Huawei patents is barred in whole or in part because NETGEAR purchases chips from Qualcomm that are licensed to NETGEAR under the Qualcomm License.

356.   On information and belief, any claim by Huawei that NETGEAR infringes Huawei patents is barred in whole or in part because NETGEAR has an implied license to Huawei's patents as a beneficiary of the terms of the Qualcomm Agreement

357.   On information and belief, because Qualcomm sells licensed modem chipsets to NETGEAR, any such sale by Qualcomm to NETGEAR exhausts any purported patent rights held by Huawei.

358.   The issue of exhaustion bears on at least NETGEAR's breach of contract,

antitrust, RICO, fraud, and unfair competition claims.

359.   As such, a declaratory judgment stating that Huawei's patent rights are subject to an implied license and/or exhausted (at least with regard to NETGEAR's products with Qualcomm's modem chipsets) will serve a useful purpose in clarifying and resolving the legal relations between NETGEAR and Huawei. Absent such relief, NETGEAR faces an imminent threat of harm that cannot be properly addressed by other available remedies.

## SEVENTH CLAIM FOR RELIEF

### (Fraud – California)

360.   NETGEAR realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

361.   In light of the importance of standardization to the increasingly technology-driven global economy, and the need to make such technologies widely available, SSOs like IEEE require that members make promises and enter into agreements that they will license their technology to be included in a standard on RAND terms and conditions.

362.   SSOs reasonably rely upon such promises to ensure that members like Huawei that have their technologies included in the standards—to the exclusion of alternatives—do not later abuse their market position to exclude rivals and other implementers from product markets.

363.   Huawei submitted LOAs to IEEE on January 6, 2007 and August 13, 2007 with the commitments identified above.

364.   Huawei submitted a LOA on May 28, 2019 refusing to enter RAND-compliant licenses. Then, on July 25, 2019, Huawei reversed course and issued a LOA to IEEE for IEEE.11ax for its standard-essential Wi-Fi 6 patents.  Huawei also submitted another LOA on July 25, 2019, with the commitments identified above.

365.   In light of IEEE's patent policies, which were published to the public and the industry, entities like NETGEAR that develop, invest in and provide products

using standards continued to develop, invest in and provide those products, as opposed to pursuing viable alternative technologies that were available.

366.   By issuing each of its LOAs promising to license on RAND terms and conditions, Huawei knowingly, or recklessly and without regard to its truth, made a false promise to the IEEE that it would license its technology on RAND terms and conditions so as to induce the IEEE to adopt its technology. Huawei affirmatively misrepresented its intent to license its technologies on RAND terms and conditions to the IEEE. Huawei, as part of its efforts to have its patents declared essential, falsely committed to offer licenses on RAND terms and conditions to the essential patents.

367.   Huawei knew that absent such a promise, the IEEE would not have adopted its technology and would have searched for alternatives, revised or even abandoned the standard altogether if a viable alternative could not be found that avoided Huawei's technology.

368.   As a result, NETGEAR alleges knowingly false misrepresentations by Huawei intended to induce reliance by both the IEEE and NETGEAR and reliance by IEEE and NETGEAR upon these false statements that resulted in damages to NETGEAR.

369.   Huawei thus intended to induce, and did induce, the IEEE to rely on Huawei's false promise and allegedly adopt Huawei's technology into the Wi-Fi standards.  Huawei thus further intended to induce, and did induce, NETGEAR to rely on Huawei's false promise and allegedly adopt Huawei's technology into the Wi-Fi standards.

370.   In light of the IEEE's patent policies, which were published to the public and the industry, entities like NETGEAR that invest in and use equipment using standards continued to invest in that equipment as opposed to pursuing viable alternative technologies that were available. NETGEAR reasonably relied upon Huawei's commitments to the IEEE that Huawei would license its SEPs at RAND terms and conditions.

105
COMPLAINT

371. In reliance upon Huawei's promise to offer RAND licenses and to its detriment, NETGEAR expended substantial resources in research and development, manufacturing and marketing of products that comply with the Wi-Fi IEEE standards, which allegedly incorporate Huawei's SEPs.

372. For example, NETGEAR's research and development team relies on commitments to standard-setting bodies when analyzing and determining whether to invest in developing equipment containing certain technology. If NETGEAR's team had known that Huawei would not live up to its RAND commitments, the team would have made different decisions regarding its development efforts.

373. Once the technologies were widely adopted, and the industry became locked into the standards that allegedly incorporate Huawei's patents, Huawei reneged on its promise by exploiting its new-found market power to demand unreasonable and excessive royalties and terms, far in excess of the patents' own value in an effort to dominate the telecommunications markets in California, the United States, and globally.

374. To date, Huawei has failed to offer NETGEAR a license on RAND terms and conditions for any of the patents it claims to be essential to the Wi-Fi standards and that it committed to license on RAND terms and conditions.

375. From the initiation of licensing discussions between NETGEAR and Huawei, NETGEAR has consistently urged Huawei to furnish fundamental details essential for NETGEAR to assess whether Huawei's proposed rate is, in fact, fair, reasonable, and non-discriminatory. This includes any evidence that companies are paying the royalty rates that Huawei is proposing to NETGEAR, along with copies or overviews of comparable license agreements.

376. The only offer that Huawei made failed to comply with its RAND obligations. ██████████████████████████ ████████ and Huawei has repeatedly refused to provide any meaningful information about any license agreements covering the SEP patents with other

106
COMPLAINT

companies.

377. Huawei failed to comply with its RAND promises and obligations by attempting to extort exorbitant non-RAND royalty rates from NETGEAR and knowingly and intentionally failed to provide the relevant information and transparency in the negotiations that RAND requires. Huawei demanded an exorbitant royalty rate and never decreased its rate during negotiations, thus violating its duty to negotiate in good faith and evidencing its fraudulent intent and design.

378. Huawei's commitments to the IEEE were misrepresentations that Huawei knew were untrue at the time they were made. Huawei has refused to license its alleged SEPs on RAND terms and conditions, including by offering non-RAND terms and conditions and refusing to negotiate in good faith. Each of the above commitments and misrepresentations by Huawei and its representatives to the IEEE were material and false. Huawei knew that these commitments and representations were false and intended to induce implementers and users of the relevant standards, such as NETGEAR, to continue to implement and use the relevant standard, and NETGEAR actually and justifiably relied on these commitments and misrepresentations to its detriment and injury.

379. Huawei engaged in further fraudulent activity by asserting that NETGEAR requires a license to patents covered by or exhausted by the Qualcomm License while knowing that, upon information and belief, NETGEAR was impliedly licensed to Huawei's patents through Qualcomm. *See supra* ¶¶ 348-59.

380. Huawei asserts that NETGEAR requires a license to certain Huawei patents because, among other things, NETGEAR's products practice certain standards, including the Wi-Fi 6 standard (IEEE 802.11 ax specification) and Pre-Wi-Fi 6 standards which include all IEEE 802.11 series standard specifications finally approved or adopted by IEEE, and published in their final form before the release date of final form of the Wi-Fi 6 standard (including IEEE 802.11n and IEEE 802.11ac specifications).

381.   NETGEAR, directly or through retailers, sells and has sold products in the United States, California and this district that comply with the Wi-Fi 6 standard and Pre-Wi-Fi 6 standards. Such products include, at least in part, the products identified in Huawei's July 9, 2020 letter to NETGEAR. Huawei has asserted that these products infringe Huawei's patents because these products practice the identified Wi-Fi standards.

382.   On information and belief, any claim by Huawei that NETGEAR infringes Huawei patents is barred in whole or in part because NETGEAR purchases modem chipsets from Qualcomm that are impliedly licensed and/or exhausted under the Qualcomm License.

383.   As a result of Huawei's false promises and fraudulent conduct, and NETGEAR's reasonable reliance on these promises, NETGEAR has been injured in its business or property, and is threatened by imminent loss of profits, and loss of customers and potential customers and its business in California, in the United States, and globally.

## EIGHTH CLAIM FOR RELIEF

### (Negligent Misrepresentation - California)

384.   NETGEAR realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

385.   As discussed above, Huawei falsely represented that it would license its technology on RAND terms and conditions without reasonable grounds for believing that to be true and with the intent to induce reliance by others on its misrepresentation. NETGEAR has reasonably relied on Huawei's misrepresentation to the IEEE and suffered damage, including expending resources to comply with applicable standards, as a result.

386.   Huawei submitted LOAs to IEEE on January 6, 2007 and August 13, 2007 with the commitments identified above.

387.   Huawei submitted an IEEE Declaration of SEP Form on May 28, 2019

refusing to enter in RAND-compliant licenses. Then, on July 25, 2019, Huawei reversed course and issued an LOA to IEEE for IEEE.11ax for its standard-essential Wi-Fi 6 patents. By issuing the LOAs to IEEE, Huawei, without reasonable grounds for believing it to be true, made a false promise that it would license its technology on RAND terms and conditions to induce the adoption of its technology. Huawei affirmatively misrepresented its intent to license its technologies on RAND terms and conditions to the IEEE.

388.   In reliance upon Huawei's misrepresentation to offer RAND licenses and to its detriment, NETGEAR expended substantial resources in research and development, manufacturing and marketing of products that comply with the IEEE standards, which allegedly incorporate Huawei's patents.

389.   Huawei's commitments to the IEEE were misrepresentations that Huawei knew were false at the time they were made. Huawei has refused to license its declared essential patents on RAND terms and conditions, including by offering supracompetitive non-RAND terms and conditions and refusing to negotiate in good faith. Each of the above commitments and misrepresentations by Huawei and its representatives to the IEEE were material and false. Huawei knew these commitments and representations were intended to induce implementers and users of the relevant standards, such as NETGEAR, to continue to implement and use the relevant standard, and NETGEAR actually and justifiably relied on these commitments and misrepresentations, to its detriment and injury.

390.   As a result of Huawei's false promises and fraudulent and negligent conduct, and NETGEAR's reasonable reliance on these promises, NETGEAR has been injured in its business or property, and is threatened by imminent loss of profits, and loss of customers and potential customers and its business in California, in the United States, and globally.

## NINTH CLAIM FOR RELIEF

### (Promissory Estoppel – California)

391.   NETGEAR realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

392.   As discussed above, Huawei made a clear and definite promise to offer and grant a license to its IEEE 802.11 essential patents to NETGEAR and others on RAND terms and conditions. NETGEAR has reasonably relied on this obligation and has been injured by its reliance because Huawei refuses to offer a license on RAND terms and conditions.

393.   Huawei submitted LOAs to IEEE on January 6, 2007 and August 13, 2007 with the commitments identified above.

394.   Huawei submitted an IEEE Declaration of SEP Form on May 28, 2019 refusing to enter in RAND-compliant licenses. Then, on July 25, 2019, Huawei reversed course and issued a Letter of Assurance to IEEE for IEEE.11ax for its standard-essential Wi-Fi 6 patents. By issuing the Letter of Assurance to IEEE, Huawei promised that it would license its technology on RAND terms and conditions to induce the adoption of its technology.

395.   In reliance upon Huawei's promise to offer RAND licenses and to its detriment, NETGEAR expended substantial resources in research and development, manufacturing and marketing of products that comply with the IEEE standards, which allegedly incorporate Huawei's patents.

396.   In further reliance on Huawei's promises, NETGEAR expected to be able to develop and market standard-compliant products without having to defend against court action and without being potentially subject to exorbitant royalties unless Huawei first offered NETGEAR RAND licenses to its allegedly essential patents.

397.   Huawei is estopped from reneging on these promises to IEEE, its members, designers, and sellers of products implementing the 802.11 standards, under the doctrine of promissory estoppel. The intended purpose of Huawei's promises was

110
COMPLAINT

to induce reliance by NETGEAR and others. Huawei knew or should have reasonably expected that its promises would induce companies to produce products compliant with the relevant standards.

398.   NETGEAR has been harmed as a result of its reasonable reliance on Huawei's promises. NETGEAR has been forced to expend resources to defend Huawei's assertion of its SEPs in Germany, the UPC, and China. NETGEAR has also been threatened by the loss of profits, loss of customers and potential customers, loss of goodwill and product image, uncertainty in business planning, and uncertainty among customers and potential customers.

## TENTH CLAIM FOR RELIEF

### (Unfair Business Practices Under Cal. Bus. & Prof. Code § 17200)

399.   NETGEAR re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

400.   Unfair business practices under Cal. Bus. & Prof. Code § 17200 et seq. include any unfair, unlawful, or fraudulent business act or practice. The conduct described above comprises unfair business practices under § 17200 et seq.

401.   Misconduct and injuries pertaining to the above-referenced conduct have occurred within California, either of which gives rise to a § 17200 claim. Additionally, Huawei engaged in unfair business practices by asserting that NETGEAR requires a license to patents covered by or exhausted by the Qualcomm License while knowing, upon information and belief, that NETGEAR was licensed to Huawei's patents through Huawei's license with Qualcomm. *See supra* ¶¶ 348-59.

402.   With respect to injury in California, NETGEAR conducts business related to the identified Wi-Fi standards and NETGEAR Products in California and sells NETGEAR Products to customers located in California.

403.   In addition to injuries in California, various acts of misconduct alleged in the preceding counts and Section IV occurred in California, including relevant mail and wire communications in furtherance of Huawei's and the Huawei Enterprise's

scheme to defraud and Huawei's bad faith and non-RAND assertions and licensing offers.

404. NETGEAR is entitled to remedies, including attorneys' fees or any recoveries obtained through the inappropriate conduct set forth above.

## PRAYER FOR RELIEF

WHEREFORE, NETGEAR respectfully requests the following:

A. A judgment in NETGEAR's favor and against Huawei on all causes of action alleged herein;

B. A declaration that Huawei has monopolized the Relevant Wi-Fi Technology markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

C. A declaration that Huawei has attempted to monopolize the Relevant Wi-Fi Technology markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

D. Recovery of actual damages from Defendant according to proof at trial;

E. An award of treble NETGEAR's damages, in an amount to be proven at trial, caused by Huawei's monopolistic conduct;

F. An award of actual and treble damages pursuant to 18 U.S.C. § 1964 (RICO) from Huawei;

G. Attorneys' fees incurred in connection with this action pursuant to 18 U.S.C. § 1964(c);

H. Costs incurred in connection with this action pursuant to 18 U.S.C. § 1964(c);

I. A judgment that Huawei is liable for breach of its contractual commitments to the IEEE;

J. A decree that NETGEAR is entitled to an implied license to Huawei patents under the Qualcomm License at least as to NETGEAR's products with Qualcomm modem chipsets, including Huawei patents in the Relevant Wi-Fi market;

K. A decree that the Qualcomm License exhausts any purported patent rights held by Huawei at least as to NETGEAR's products with Qualcomm modem

112
COMPLAINT

chipsets;

L.     An award of punitive damages resulting from Huawei's fraud, oppression and malice associated with Huawei's unlawful conduct.

M.     Enter a judgment awarding NETGEAR its expenses, costs, and attorneys fees under any other applicable laws;

N.     An award of pre-judgment and post-judgment interest to the full extent allowed under the law; and

O.     Such other and further relief as this Court deems just and proper.

## JURY DEMAND

NETGEAR, Inc. hereby demands a jury trial on all issues and claims so triable.

DATED: January 30, 2024

Respectfully submitted,
MCKOOL SMITH, P.C.

BY: */s/ Alan P. Block*
    Alan P. Block (SBN 143783)
    **MCKOOL SMITH, P.C.**
    300 South Grand Avenue, Suite 2900
    Los Angeles, CA 90071
    Telephone: (213) 694-1200
    Facsimile: (213) 694-1234
    Email: ablock@McKoolSmith.com

    Blair M. Jacobs (*pro hac vice* forthcoming)
    Christina A. Ondrick (*pro hac vice* forthcoming)
    John S. Holley (*pro hac vice* forthcoming)
    Elizabeth T. Bernard (SBN 309010)
    Arvind Jairam (*pro hac vice* forthcoming)
    Stuart S. McCommas (*pro hac vice* forthcoming)
    **MCKOOL SMITH, P.C.**
    1999 K Street, NW, Suite 600
    Washington, District of Columbia 20006
    Telephone:   (202) 370-8300
    Facsimile:    (202) 370-8344
    Email: bjacobs@McKoolSmith.com

    Attorneys for Plaintiff NETGEAR, Inc.

113
COMPLAINT